**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**DAVID BRADEN,**

       **Petitioner,**

    **v.**                                     **Case No. 2:04cv842**
                                                   **JUDGE SARGUS**

**MARGARET BAGLEY, Warden,**         **Magistrate Judge Kemp**

       **Respondent.**

### OPINION AND ORDER

Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this

Court a habeas corpus action under 28 U.S.C. §2254.  This matter is before the Court upon

respondent's motion to dismiss procedurally defaulted claims, (doc.no. 21), petitioner' response

in opposition, (doc.no. 28), and respondent's reply, (doc.no. 29).  Also before the Court is

petitioner's sur-reply (doc.no. 30).[1]

### I. Factual History

The facts and procedural history of this case were set forth by the Supreme Court of Ohio

in *State v. Braden*, 98 Ohio St. 3d 354 (2003):

> David L. Braden was distraught that his relationship with Denise Roberts
> might be ending.  Roberts resided with her father, 83-year-old Ralph Heimlich, at
> his Columbus home.  Heimlich thought that Braden was a "scumbag" and wanted
> Roberts to end her relationship with Braden.
>
> On August 3, 1998, Braden showed up at Roberts's workplace and argued
> with her in the parking lot.  They continued to argue following dinner that
> evening, and Braden damaged Heimlich's car.  Later that evening, Braden armed
> himself and went to Roberts's home.  There, he shot Roberts once in the head,
> and he repeatedly shot Heimlich, killing them both.  Braden was convicted of the
> aggravated murders of Roberts and Heimlich and sentenced to death.

---

[1]     Petitioner's motion for leave to file a sur-reply, (doc.no. 30), is GRANTED.

The evidence against Braden included testimony and videotape showing Braden arguing with Roberts at her place of employment, testimony that Braden brandished a pistol prior to the murders, Roberts's complaint filed with police an hour before the murders that Braden had "keyed" her father's car, testimony identifying Braden as the person leaving the crime scene, evidence that Braden did not return to his home until 45 minutes after the murders, and forensic testimony that bullets removed from the victims' bodies were similar to bullets found at Braden's home.

*State's Case*

Shortly after 6:00 p.m. on August 3, 1998, Denise Roberts talked to Victoria Hauser, a co-worker at Merck-Medco in Columbus, about her personal life. According to Hauser, conflict between Braden and Roberts's father was ongoing. Roberts expressed her love for Braden, but Heimlich thought he was a "scumbag." After their conversation, Hauser "demanded that [Roberts] walk out with [her] and that [they] stop and talk with security on the way out" of the building.

Braden was waiting at Merck-Medco to meet Roberts as she left work. Braden had arrived at Merck-Medco's entrance, had told the security guard he "was here to pick his girlfriend up," and had signed his name has "Joe Bob, visitor" on the visitor's log. Braden waited for a few minutes and then went outside.

Roberts had spotted Braden's van in the Merck-Medco parking lot before she left the building, and she asked a security guard to "keep on eye on her as they walked out to their car because she didn't *** know why her boyfriend was on the property." Roberts declined the security guard's offer for an escort to her car because "she was fearful that that would make [Braden] angry." However, parking lot surveillance cameras were directed on Braden's van, and a security vehicle followed Roberts and Hauser while they walked to Roberts's car.

Braden pulled up his van to block Roberts and Hauser while they were walking towards the parking lot. Braden said, "Hi baby," and told Roberts that he wanted to talk to her. Roberts was "terrified." She told Braden that Hauser "was walking [her] to her car because Roberts had something in her car that she wanted to give Hauser." Braden told Roberts that "he would follow her to the car," and told Hauser to "get the fuck out of here, I want to talk to my girlfriend ***."

The guard in the security vehicle approached Braden after observing him talk to the two women. Upon being approached, Braden said, "What is this? What do I look like? I'm her boyfriend. Do I look like a murderer?" Roberts agreed that Braden was her boyfriend, and the security guard resumed driving around the parking lot to make sure there was no physical violence.

2

Roberts drove Hauser back to the front of the building, and Hauser returned to work. Before leaving, Hauser told Roberts, "[P]lease come to my house, don't go home, don't get out of your car, don't talk to him, he's going to kill you." Surveillance footage shows that Braden and Roberts got out of their cars, had an "intense" conversation, and then returned to their vehicles and left the parking lot.

At approximately 7:30 p.m., Roberts was at Braden's home on Acton Road in Columbus. Shawn Craddock was visiting his mother, Braden's next-door neighbor, and heard Roberts and Braden arguing. Craddock overheard Braden say, "[T]his was bullshit," although he did not hear what else they said. Roberts was later heard getting into her car and pulling out of Braden's driveway.

Sometime between 8:00 p.m. and 9:30 p.m., Roberts went to a police substation and reported that Braden had damaged her car. Officer Michael Tucker described her as "kind of hysterical" and said, "I could tell she had been crying because some of her makeup was running down her face a little bit." Roberts reported that "she had just gotten in an argument with her boyfriend and that he had keyed up her car." Roberts recounted events leading up to this incident, saying "that [Braden] had showed up at her work and that they had talked a little bit, and he had talked her into going to dinner. She *** went back to his house, and they got into another argument. She said she got in her car, he wanted to get inside the car and couldn't, and that is when he scratched the car up."

Officer Tucker did not take an incident report since the car was in her father's name. Roberts was advised to have her father call the police station and have a report taken then. After they had finished talking, Tucker viewed the damage, which "appeared to be scratch marks from *** a key or something like that on the hood and on the side of the door and on top of the car." Roberts then returned home, and Officer Tucker drove "towards [Braden's] house, to see if [he] could either see him outside or ***, maybe talk to him about it."

Between 9:30 and 9:45 p.m., Craddock was backing his car out of his mother's driveway and saw Braden "standing in the center window *** and it appeared *** that he was pointing a gun at" Craddock. Craddock drove to the nearest pay phone and called the police. At around 10:00 p.m., Craddock called his mother, who said "[H]e's just now leaving."

After calling the police, Craddock pulled his van behind Officer Tucker's police cruiser as it was parked on Acton Road. Craddock reported that Braden had just pointed a firearm at him. He also reported that "he had trouble with [Braden] in the past, *** [and] every time he gets into it with his girlfriend, he basically goes crazy."

3

At 9:53 p.m., Roberts called Marion Orr, a police dispatcher, requesting that the police come to her home to take a report on Braden's "keying" of her father's car.  Since this was not a high priority incident, the police did not immediately dispatch a cruiser to Heimlich's residence.

Roberts and Heimlich lived on Barthel Road in east Columbus.  Shortly after 10:00 p.m. Irvin Ringler II who lived across the street, heard "five pops" sequenced as "three quick ones followed by a pause, and then another one, a pause, and then another pop."  Ringler went outside and saw a man wearing a red shirt and blue jeans walking across a lawn.  At the same time, Judith Gall, Heimlich's next door neighbor, heard noises that "sounded like a hammer hitting an aluminum garage door."

At about the same time, Patricia Cooper, who also lived on Barthel Road, was picking up her dog at her mother's nearby home when she heard "popping sounds."  As Cooper approached her house, she saw a man with a reddish shirt walking down Heimlich's driveway, and "his left hand was shielding his face with his face facing down to the ground."

Charlotte Proctor, who lived across from Heimlich, also heard noise outside and went to investigate.  Proctor noticed that all of Heimlich's exterior lights were on.  After a few minutes, Proctor saw a man in a red tee-shirt and with a ponytail walk from the back of Heimlich's home, open and close the gate, walk down the street to a parked van, and drive away.

Proctor and Gall discovered Roberts's and Heimlich's bodies after entering Heimlich's home through an open front door.  Columbus police officers arrived at the scene after Proctor and Gall called 911.

Police officers found Roberts's body lying towards the back of Heimlich's house near a box of spilled kitty litter.  Heimlich's body was lying in the kitchen. The police found no sign of forced entry or evidence of theft in the house.  Police found an expended .38 caliber nyclad-coated bullet on the living room floor and found a similar .38 caliber bullet lying on the kitchen floor near Heimlich's body. A nyclad-coated bullet is a lead bullet with a nylon coating over the lead surface. A firearms expert noted that out of 150 to 200 sets of bullets he examines in a given year, "no more than *** five to ten" are nyclad-coated bullets.

A telephone answering machine tape that was recovered from the crime scene revealed this message: "Denise, call me, please call me now, please call me now, please!  This is David, please call me now!"  Phone records showed that at 9:35 p.m. on August 3, 1998, a phone call was made from Braden's home phone to Roberts's home phone.

4

Examination of Heimlich's car showed fresh scratches on the hood, roof, trunk, and passenger side of the vehicle. Police found fingerprints of Braden's left middle and left ring fingers on the right windshield pillar of the car.

Neighbors provided the police with the suspect's description and identification of his blue van. Meanwhile, Orr heard reports on the police radio about the shooting deaths of two people on Barthel Road, and upon remembering the earlier call from that address, provided police with Braden's name and address.

Sometime after 10:30 p.m., a police helicopter flew over Braden's home looking for his blue van. The officer did not spot his blue van, and the helicopter continued to fly over Braden's house every fifteen minutes. At 11:31 p.m., the officer spotted the blue van parked outside Braden's home.

At approximately 11:30 p.m., officers from the Columbus special weapons and tactics ("SWAT") team went to Braden's home. Braden's van was parked at the house, and the hood was warm, indicating that it had been running recently. Braden was spotted through a bathroom window in the back of the house toweling off after a shower.

SWAT members took Braden into custody, but Braden did not act surprised when the police arrived. He appeared "very casual, very nonchalant," and he had wet hair. Braden's mother was in the house along with two dogs. Police secured the scene and began collecting evidence from Braden's home.

Police found Braden's red shirt inside the washing machine. No firearms were found at either Heimlich's or Braden's home. However, police found a box containing 44 nyclad-coated .38 caliber bullets in Braden's bedroom desk. Six shells were missing from the box of 50 bullets.

The police recovered white particles that appeared to be kitty litter from the driver's seat of Braden's van. However, no lab analysis was conducted to confirm that these particles were kitty litter.

At approximately 2:30 a.m. on August 4, 1998, Proctor was escorted to Braden's home, where she identified Braden as the man she observed leaving Heimlich's residence. However, Proctor told police that "[s]he had a problem with his hairstyle viewing him on Acton. She stated that the individual she saw leaving Barthel had a ponytail at the time, and when she viewed the defendant at the Acton address, his hair was down, it was not in a ponytail."

Dr. Keith Norton, a Franklin County Deputy Coroner, found that Roberts had died from a single gunshot to the head. Bullet fragments removed from

Roberts's head were from a nyclad-coated .38 caliber bullet. According to
Norton, Heimlich died from gunshot wounds to the chest, eye, and neck.
Altogether, Heimlich was shot four times, and a fifth bullet may have grazed his
shoulder. Heimlich had also been shot with nyclad-coated .38 caliber bullets.

### Defense Case

The defense introduced hiking boots and shoes taken from Braden's home
on August 3, 1998. Additionally, stipulated expert testimony and a lab report
were introduced showing that no blood was found on the hiking boots, shoes,
socks, undershorts, pants, and shirt seized from Braden's residence.

### Trial Result

A grand jury indicted Braden on two counts of aggravated murder. Count
I charged Braden with the aggravated murder of Denise Roberts with prior
calculation and design. Count II charged Braden with the aggravated murder of
Ralph Heimlich with prior calculation and design. Both counts included a
"course of conduct" death penalty specification pursuant to R.C. 2929.04(A)(5)
and a firearms specification. The jury convicted Braden as charged and
recommended the death penalty on each count. The trial court sentenced Braden
to death on each count, three years' confinement on the firearms specification,
and a $50,000 fine.

*Braden*, 98 Ohio St. 3d at 354-59.

## II. State Court History

### A. Trial and Direct Appeal

Following his indictment on August 13, 1998, petitioner was arraigned and entered not

guilty pleas on August 17, 1998. The trial court appointed attorneys Thomas D. Beal and Phillip

Lon Allen to represent petitioner. The trial commenced on May 4, 1999, and, on May 11, 1999,

the jury returned verdicts finding petitioner guilty as charged in the indictment. The sentencing

phase commenced on May 18, 1999, and, on May 20, 1999, the jury returned two verdicts, one

as to each victim, recommending that petitioner be sentenced to death. The trial court, pursuant

to O.R.C. §2929.03(f), issued a sentencing opinion accepting the jury's recommendation that

petitioner be sentenced to death.

Represented by W. Joseph Edwards and Brian Rigg, petitioner filed a notice of appeal on

August 5, 1999, and an amended notice of appeal on August 16, 1999.  On April 3, 2000,

petitioner filed an appellate brief raising the following issues:

> Proposition of Law One: Imposition of the death sentence violates the Sixth,
> Eighth, and Fourteenth Amendments to the U.S. Constitution and Article I,
> Section 2, 9, 10 and 16 of the Ohio Constitution.

> Proposition of Law Two: Where the trial court erred by refusing to give the jury a
> voluntary manslaughter instruction.

> Proposition of Law Three: Where the trial court allows the alternate jurors to
> retire to the jury room with the twelve regular jurors, the trial court commits
> reversible error and deprives the accused of his rights to a trial by a fair and
> impartial jury and due process of law, as guaranteed by the Sixth and Fourteenth
> Amendments to the United States Constitution and Article One, Sections Ten and
> Sixteen of the Ohio Constitution.

> Proposition of Law Four: A change in the Ohio Constitution, which provides less
> review to capital appellants (whose crimes were committed on or after January 1,
> 1995), violates the Fourteenth Amendment and fails to provide the meaningful
> appellate review mandated by the Eighth Amendment.

> Proposition of Law Five: Multiple instances of deficient performance in the
> conduct of the eligibility and penalty phase of a capital trial coupled with
> prejudice inuring to the detriment of the defendant result in the denial of the right
> to a fair trial and the right to effective assistance of counsel under the Sixth and
> Fourteenth Amendments to the United States Constitution.

> A.    It is ineffective to argue to the jury that they must first decide whether to
> impose the death penalty and if it is not appropriate then to consider the life
> sentence options.

> B.    Trial counsel has a duty to object to erroneous jury instructions telling the
> jury that they must unanimously acquit a person of the crime and the
> specifications before they may consider lesser offenses.

> C.    Trial counsel should have opposed instructions that permitted the jury to
> aggregate circumstances and collectively weigh aggravating circumstances
> against mitigating factors.

> D.    In the penalty phase of a capital trial defense counsel has a duty to oppose

7

that admission of prosecution evidence that does not relate to the proven aggravating circumstances.

E.   Defense counsel failed to zealously represent Appellant when they failed to object to hearsay testimony.

F.   Defense counsel failed to raise the issue of Appellant's competency during trial.

G.   Counsel for Appellant was ineffective for failing to call a psychologist during the trial phase.

H.   Voir Dire regarding death penalty issues.

I.   All errors committed cumulatively committed [sic] by defense counsel violated Appellant's rights to a fair trial.

J.   Summary.

Proposition of Law Six: Appellant's convictions for aggravated murder are against the manifest weight of the evidence.

Proposition of Law Seven: To sustain a conviction for aggravated murder under 2903.01(A) there must be evidence of prior calculation and design.

Proposition of Law Eight: During the trial phase the court erroneously instructed the jury on causation.

Proposition of Law Nine: A jury instruction that requires a life sentence recommendation be unanimous materially prejudices a capital defendant's right to a fair trial and to be free from deprivation of life without due process of law under the Fourteenth Amendment to the United States Constitution.

Proposition of Law Ten: Multiple instances of counsels' deficient performance during the penalty phase of a capital trial result in the denial of the right to a fair trial and the right to effective assistance of counsel under the Ohio and Federal Constitutions.

Proposition of Law Eleven: Prosecutorial misconduct during the closing argument of the penalty phase which undermines one's confidence in the jury's recommendation of a death sentence is sufficient to vacate the sentence.

Proposition of Law Twelve: The death penalty authorized by the Ohio Revised Code deprives capitally-charged defendants of their lives without due process of

law, denies equal protection and imposes cruel and unusual punishment in violation of the Ohio and United States Constitutions.

Proposition of Law Thirteen: Sentencing an individual to death in violation of treaties to which the United States of America is a signatory violates the Supremacy Clause of the United States Constitution and requires Mr. Baden's [sic] sentence to be reversed.

Proposition of Law Fourteen: The accused's right to due process under the Fourteenth Amendment to the United States Constitution is violated when the State is permitted to convict upon a standard of proof below proof beyond a reasonable doubt.

Proposition of Law Fifteen: Appellant is denied his right to a fair trial when the trial court fails to remove for cause jurors predisposed to return a death verdict contra the Ohio and federal Constitutions.

(App.Vol. 3, at 38.) On April 2, 2003, the Supreme Court of Ohio issued a decision rejecting

petitioner's propositions of law and affirming petitioner's convictions and death sentences. *State*

*v. Braden, supra*, 98 Ohio St. 3d 354; App.Vol. 3, at 234.

On October 6, 2003, the Supreme Court of the United States denied petitioner's petition

for a writ of *certiorari.* (App.Vol. 3, at 277.)

B. Postconviction Proceedings Pursuant to O.R.C. §2953.21

On July 2, 1999, just as his direct appeal proceedings were beginning, petitioner filed in

the trial court a notice of intent to file a postconviction action and a request for the appointment

of counsel. On July 7, 1999, the trial court appointed the Office of the Ohio Public Defender and

Assistant State Public Defender Richard J. Vickers. (App.Vol. 2, at 204.) On June 9, 2000,

petitioner filed a postconviction petition raising the following grounds for relief:

First Ground for Relief: Petitioner Braden's convictions and sentences are void or voidable because David Braden was tried while incompetent. This error violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

9

Second Ground for Relief: Petitioner Braden's convictions and sentences are void or voidable because trial counsel's ineffectiveness deprived the trial court of the information it needed to hold a hearing, pursuant to *Drope v. Missouri*, 420 U.S. 162 (1975), regarding David Braden's competence to stand trial. This error violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

Third Ground for Relief: Petitioner Braden's convictions and sentences are void or voidable because the trial court failed to hold a competency hearing pursuant to *Drope v. Missouri*, 420 U.S. 162 (1975), regarding David Braden's competence to stand trial. This error violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

Fourth Ground for Relief: Petitioner Braden's convictions and sentences are void or voidable because trial counsel's ineffectiveness in not obtaining psychiatric assistance resulted in Braden being deprived of his right to be tried while competent. This error violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

Fifth Ground for Relief: Petitioner Braden's convictions and sentences are void or voidable because trial counsel's ineffectiveness in not moving for a competency determination resulted in Braden being tried while incompetent. This error violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

Sixth Ground for Relief: Petitioner Braden's convictions and/or sentences are void or voidable because he was denied the effective assistance of counsel in the mitigation phase of his capital trial as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

Seventh Ground for Relief: Petitioner Braden's convictions and/or sentences are void or voidable because juror misconduct occurred during the jury deliberations, thus denying him a fair and impartial determination of his sentence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

Eighth Ground for Relief: Petitioner Braden's conviction and sentence are void or voidable because the post-conviction process provides an inadequate corrective

process.

Ninth Ground for Relief: Petitioner Braden's convictions and/or sentences are void or voidable because the death penalty is disproportionately meted out to those defendants who are racial minorities and/or those defendants who are accused of killing white victims. This disparity exists in Franklin County, the state of Ohio and in all of the thirty-seven (37) states in the United States that have provisions for capital punishment.

Tenth Ground for Relief: The judgment and sentence against Petitioner are void or voidable because the death penalty as administered by electrocution in the state of Ohio violates his constitutional rights to protection from cruel and unusual punishment and to due process of law.

Eleventh Ground for Relief: The judgment and sentence against Petitioner are void or voidable because the death penalty as administered by lethal injection in the state of Ohio violates his constitutional rights to protection from cruel and unusual punishment and to due process of law.

Twelfth Ground for Relief: Petitioner Braden's convictions and sentences are void or voidable because trial counsel's ineffectiveness in presenting mitigating evidence deprived David Braden of his right to have the jury consider all relevant mitigating evidence. This dereliction violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

Thirteenth Ground for Relief: Petitioner Braden's judgment and sentence are void or voidable because, assuming *arguendo* that none of the Grounds for Relief in his Post-Conviction Petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions as presented in the Petition's foregoing paragraphs have been prejudicial and have denied Petitioner his rights as secured by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 2, 9, 10, and 16 of the Ohio Constitution.

(App.Vol. 4, at 30.) On June 13, 2000, petitioner filed his first amendment to his postconviction

petition, adding an affidavit, *i.e.*, exhibit 20, to support his twelfth and thirteenth grounds for

relief. (App.Vol. 4, at 242.)

On February 4, 2000, the trial court issued an order setting the matter for an evidentiary hearing "on the issue of Petitioner's mental status at the time of the trial, as well as at the time these acts occurred." (App.Vol. 5, at 65.) The trial court conducted the evidentiary hearing on April 19, 2002 and the parties filed their post-hearing briefs on May 10, 2002. On August 2, 2002, the trial court issued a decision and entry denying petitioner's postconviction action. (App.Vol. 5, at 186.)

Petitioner appealed to the Ohio Court of Appeals for the Tenth Appellate District and, in an appellate brief filed on December 2, 2002, raised the following assignments of error:

> Assignment of Error I: The trial court erred in determining that appellant was competent when he stood trial because appellant could not assist in his defense, nor did he have a rational understanding of the proceedings against him, all in violation of his right to due process of law. U.S. Const. Amend. V, VI, VIII, XIV.
>
> Issue presented: Whether Braden was incompetent when he stood trial.
>
> Assignment of Error II: The trial court erred in applying res judicata to appellant's claims. O.R.C. § 2953.21.
>
> Issue Presented: Whether res judicata is applicable to claims upon which a hearing has been conducted.
>
> Assignment of Error III: The trial court in not considering postconviction psychiatric evidence, in violation of appellant's right to due process of law. U.S. Const. Amend. V, VI, VIII, XIV.
>
> Issue Presented: Whether the trial court violated Appellant's right to due process of law when it failed to consider his psychiatrist's testimony and opinion in the court's decision.
>
> Assignment of Error IV: The trial court erred in ruling that it did not violate defendant's right to due process of law when it failed to sua sponte hold a competency hearing during trial. U.S. Const. Amend. VI, VIII, XIV; *Drope v. Missouri*, 420 U.S. 162 (1975).
>
> Issue presented: Whether the trial court should have held a competency hearing

before or during trial.

Assignment of Error V: The trial court erred in finding that defense counsel did not provide ineffective assistance, in violation of defendant's rights under the Sixth, Eighth and Fourteenth Amendments. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

Issue presented: Whether trial counsel were constitutionally ineffective for failing to alert the trial court to the second note, and for failing to request a competency hearing.

Assignment of Error VI: The trial court erred in dismissing appellant's postconviction petition where it was supported by sufficient operative facts to merit an evidentiary hearing on all claims and discovery. *State v. Jackson*, 64 Ohio St. 2d 107 (1980).

Issue presented: Whether the trial court should have held a hearing on the remainder of appellant's claims.

(App.Vol. 6, at 37.) On December 11, 2002, petitioner filed a corrected appellate brief after being notified that his original brief, by not containing page references to the record, failed to comply with App.R. 16(A)(3). (App.Vol. 6, at 184-186.) On June 10, 2003, the appellate court issued an opinion affirming the trial court's judgment denying petitioner's postconviction action. (App.Vol. 7, at 115.)

On July 25, 2003, petitioner filed a notice of appeal to the Supreme Court of Ohio on July 25, 2003, (App.Vol. 8, at 2), and a memorandum in support of jurisdiction, (App.Vol. 8, at 5). On October 15, 2003, the Supreme Court of Ohio issued a summary entry declining to accept jurisdiction over petitioner's appeal. (App.Vol. 8, at 159.)

### III. Habeas Corpus Petition

These proceedings began on January 28, 2004, when petitioner filed a notice of intention to file a habeas corpus petition, as well as motions for leave to proceed *in forma pauperis*, for appointment of counsel, and for a stay of execution. (Doc.#'s 1-4.) In accordance with this

Court's *Order* of February 11, 2004, (Doc.# 6), the habeas corpus petition was filed on August

31, 2004.  (Doc.# 10.)  Petitioner raises the following claims for relief:

**First Ground for Relief:** Petitioner was deprived of due process of law when he was tried while incompetent.  U.S. Const. Amend. VI, VIII, XIV.

**Second Ground for Relief:** Petitioner was deprived of the opportunity to fully and fairly litigate his claims in state court when the trial court failed to consider postconviction psychiatric evidence, in violation of petitioner's right to due process of law.  Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**Third Ground for Relief:** Petitioner was deprived of due process of law when the trial court did not sua sponte hold a competency hearing when the defendant exhibited sufficient indicia of incompetence.  Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; Drope v. Missouri, 420 U.S. 162 (1975).

**Fourth Ground for Relief:** Petitioner's counsel were constitutionally ineffective for failing to protect petitioner's right to be tried while competent, in violation of defendant's rights under the Sixth, Eighth, and Fourteenth Amendments.  Strickland v. Washington, 466 U.S. 668, 686 (1984).

**A.**    Trial counsel breached the duty to inform the court of Petitioner's mental deterioration by not informing the court of the second note.

**B.**    Trial counsel did not request a competency hearing.

**Fifth Ground for Relief:** Petitioner was denied the effective assistance of counsel during the mitigation phase of his trial when counsel failed to investigate, present, and prepare important mitigating evidence, in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**Sixth Ground for Relief:** Petitioner's rights to a fair and impartial determination of his sentence, and to due process of law were violated by juror misconduct, in violation of the Sixth, Eighth, and Fourteenth Amendments.

**Seventh Ground for Relief:** Petitioner was denied the right to a trial by a fair and impartial jury and due process of law, as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution because the alternate jurors retired to the jury room with the twelve regular jurors.

**Eighth Ground for Relief:** Petitioner was denied the right to the effective

14

assistance of counsel at the culpability and penalty phases of his capital trial in violation of the Sixth and Fourteenth Amendments tot he United States Constitution.

**A.**  Defense counsel failed to zealously represent petitioner when they failed to object to hearsay testimony.

**B.**  Counsel for petitioner was ineffective for failing to call a psychologist during the culpability phase.

**C.**  Counsel failed to object to the State's improper rebuttal closing argument in the penalty phase.

**D.**  Defense counsel failed to object to the jury instructions that required the jury to first unanimously reject a death sentence before imposing a life sentence.

**Tenth Ground for Relief:** A jury instruction that requires a life sentence recommendation be unanimous materially prejudices a capital defendant's right to a fair trial, to a reliable verdict, and to be free from deprivation of life without due process of law under the Fourteenth Amendment to the United States Constitution.

**Eleventh Ground for Relief:** Prosecutorial misconduct during the closing argument of the penalty phase denied petitioner a fair trial, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**Twelfth Ground for Relief:** Petitioner was denied his right to a fair trial when the trial court failed to remove for cause jurors predisposed to return a death verdict, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**Thirteenth Ground for Relief:** Trial counsel were constitutionally ineffective for failing to present and prepare mitigating evidence when counsel did not ask the trial psychologist whether petitioner's mental disease impaired his ability to conform his conduct to law, under O.R.C. 2929.04(B)(3).

(Petition, Doc.# 10.)

Pursuant to the Court's *First Scheduling Order* of September 24, 2004, (Doc.# 12),

respondent filed a motion to dismiss procedurally defaulted claims on March 9, 2005, (Doc.#

21).  Petitioner filed a response in opposition on June 1, 2005, (Doc.# 28), and respondent filed a

reply on June 10, 2005, (Doc.# 29). Further, petitioner filed a motion for leave to file a sur-reply on June 15, 2005, (Doc.# 30). Respondent's motion to dismiss procedurally defaulted claims is thus at issue.

## IV.  Procedural Default Discussion

It does not appear that every claim petitioner has raised in his habeas corpus petition was presented to the Ohio courts either during the direct appeal or on collateral review. As a general matter, a defendant who is convicted in Ohio of a criminal offense has available to him more than one method of challenging that conviction. Claims appearing on the face of the record must be raised on direct appeal, or they will be waived under Ohio's doctrine of *res judicata*. *State v. Perry*, 10 Ohio St. 2d 175 (1967). Issues that must be raised in a postconviction action pursuant to R.C. §2953.21 include claims that do not appear on the face of the record and claims of ineffective assistance of trial counsel where the defendant was represented on direct appeal by the same attorney who represented him at trial. *State v. Cole*, 2 Ohio St. 3d 112 (1982). In 1992, a third procedure of review emerged. Claims of ineffective assistance of appellate counsel must be presented to the appellate court in a motion for delayed reconsideration pursuant to *State v. Murnahan*, 63 Ohio St. 3d 60 (1992) and Ohio R. App. P. 26(B).

In addition to raising each claim in the appropriate forum, a habeas litigant, in order to preserve his constitutional claims for habeas review, must present those claims to the state's highest court. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999). Thus, the judgment of conviction on direct appeal, and any adverse decision rendered by the trial court in postconviction, must be appealed to both the Ohio Court of Appeals and the Supreme Court of Ohio. Likewise, any adverse decision rendered by the Ohio Court of Appeals on a motion for delayed reconsideration

must be timely appealed to the Supreme Court of Ohio.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration.  28 U.S.C. §2254(b), (c).  If he fails to do so, but still has an avenue open to him by which he may present his claims, then his petition is subject to dismissal for failure to exhaust state remedies.  *Id.*; *Anderson v. Harless*, 459 U.S. 4, 6 (1982)(per curiam); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).  But if, because of a procedural default, the petitioner can no longer present his claims to the state courts, then he has also waived those claims for purposes of federal habeas corpus review, unless he can demonstrate both cause for the procedural default, as well as actual prejudice from the alleged constitutional error.  *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is waived by the petitioner's failure to observe a state procedural rule.  *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  "First, the court must decide that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule."  *Id.*  Second, the Court must determine whether the state courts actually enforced the state procedural sanction.  *Id.*  Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim.  *Id.*  Finally, if the Court has determined that a state procedural rule was not complied with, and that the rule was an adequate and

17

independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule, and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir.), *cert. denied*, 474 U.S. 831 (1985).

Respondent alleges that many of petitioner's claims, in their entirety or in part, are subject to procedural default. The Court will address each of the claims individually to determine whether those claims are subject to the procedural defaults alleged by respondent. Respondent asserts procedural default against claims one, three, four (in part), seven, and eleven (in part).

### A. Ground One – Petitioner Was Tried While Incompetent

In his first ground for relief, petitioner's counsel allege that petitioner was deprived of due process when he was tried while incompetent. (Petition, Doc.# 10, at 7-17.) According to the petition, although petitioner appeared fine to defense trial counsel Thomas Beal during their initial visits between September and December of 1998, petitioner's mental condition appeared to Mr. Beal to deteriorate after that. The petition states that Mr. Beal made the trial court aware of his concerns about petitioner's mental health, prompting the trial court to expand the role of Dr. Kathleen Burch from just examining petitioner in preparation for the mitigation phase of his trial to additionally examining petitioner for the purpose of assessing his competency to stand trial.[2] Following four evaluations, the petition continues, Dr. Burch found petitioner competent to stand trial because, although Dr. Burch harbored concerns about petitioner's delusional beliefs

---

[2]      It appears from the transcript of the postconviction evidentiary hearing that this exchange between Mr. Beal and the trial court occurred *ex parte.* (Evid.Hrng.Tr. at pp. 15-16.)

that he was a prophet of God, that he would be spared from his capital case by God, and that certain weather occurrences were related to his case, Dr. Burch was never made aware or otherwise had reason to believe that petitioner was not communicating and cooperating with his defense attorneys. According to the petition, Mr. Beal's personal trial notes, which were not revealed until petitioner's postconviction proceedings, demonstrated that petitioner in fact had not been able to cooperate with or otherwise assist his trial attorneys during the case.

Petitioner filed a postconviction action alleging, among other things, that he had been tried while incompetent. In support of that claim, he submitted an Affidavit by Dr. Douglas Mossman, who had evaluated petitioner some eight months after his trial and concluded that his "mental illness substantially compromised his understanding of the proceedings against him and his ability to consult with his lawyers in preparing his defense." (App.Vol. 4, at 96.) Also submitted were two notes that petitioner had passed to defense counsel, one during a pretrial hearing and the other during the trial phase, essentially stating that, according to God, petitioner was to be given a full pardon, new identity, travel credentials, and money. (App.Vol. 4, at 115-117.) None of these exhibits were part of the trial record, although it does appear that the trial court had at least been made aware of the first note that petitioner had passed to defense counsel. (Evid.Hrng.Tr. at 25-26.)

After reviewing petitioner's postconviction action and supporting exhibits, the trial court issued an order setting the matter for an evidentiary hearing "on the issue of Petitioner's mental status at the time of the trial, as well as at the time these acts occurred." (App.Vol. 5, at 65.) The trial court conducted the evidentiary hearing on April 19, 2002, during which petitioner called two witnesses, defense attorney Thomas Beal and Dr. Kathleen Burch, and presented as

exhibits notes that Mr. Beal took during his jail visits with petitioner, the two notes that

petitioner had passed to defense counsel, Dr. Burch's notes from her sessions with petitioner,

and an affidavit by Dr. Burch regarding her opinion as to petitioner's mental state at the time of

the offense. The trial court also considered, in lieu of live testimony, the Affidavit by Douglas

Mossman, M.D., which petitioner had submitted in support of his postconviction action. The

parties filed their post-hearing briefs on May 10, 2002.

On August 2, 2002, the trial court issued a decision and entry denying petitioner's

postconviction action. (App.Vol. 5, at 186.) Regarding petitioner's claim that he was tried while

incompetent, the trial court declined to consider the Affidavit by Douglas Mossman, M.D., due

primarily to the fact that his evaluation of petitioner's competency to stand trial had taken place

some eight months after the trial, (App.Vol. 5, at 200); determined that Dr. Burch's "changed

opinion" was not credible, (App.Vol. 5, at 205); and concluded that petitioner's claim,

accordingly, could have been raised on direct appeal and was therefore barred under Ohio's

doctrine of *res judicata*, (App.Vol. 5, at 205-206). The Ohio Court of Appeals for the Tenth

Appellate District affirmed the trial court's rationale for applying the *res judicata* doctrine

against petitioner's competency claim, and added, "even if the trial court would have accepted

both Drs. Burch and Mossman's opinions, we agree that res judicata could be applied under the

present circumstances." (App.Vol. 7, at 123.)

Respondent argues that petitioner's claim is procedurally defaulted under Ohio's doctrine

of *res judicata*. (Motion to Dismiss, Doc.# 21, at 2-3.) Alternatively, respondent notes,

petitioner's claim was denied in postconviction on grounds that Dr. Burch concluded during trial

that petitioner was competent and that petitioner's demeanor during trial did not contradict Dr.

Burch's conclusion. (*Id*. at 3.)

Petitioner offers several arguments in response. Initially, petitioner argues that, "[a]s a matter of law, a substantive ground of competence to stand trial can not be procedurally defaulted." (Petitioner's Response, Doc.# 28, at 4.) Petitioner goes on to argue that, even assuming the claim could be procedurally defaulted, his claim is not procedurally defaulted because it was properly raised in postconviction. Petitioner argues that the claim could not have been raised on direct appeal because it relied on and was supported by evidence outside the trial record, which evidence even persuaded the trial court to order an evidentiary hearing. Petitioner reasons, "[f]or the trial court to grant the evidentiary hearing, it first had to determine that the three exhibits contained sufficient operative facts to demonstrate the existence of the constitutional violation asserted – that Petitioner was tried while incompetent – and that the exhibits were not specious." (Petitioner's Response, Doc.# 28, at 6.) Petitioner goes on to argue that the trial court, during the evidentiary hearing, admitted several additional exhibits. In sum, according to petitioner, the state courts erred in applying the doctrine of *res judicata* against his claim that he was tried while incompetent.

The Court rejects petitioner's initial argument that a substantive claim of incompetence can never be procedurally defaulted. Petitioner cites *Medina v. Singletary*, 59 F.3d 1095 (11th Cir. 1995); *Sena v. New Mexico State Prison*, 109 F.3d 652, 654 (10th Cir. 1997); *Nguyen v. Reynolds*, 131 F.3d 1340, 1346 (10th Cir. 1997); and *Johnston v. Singletary*, 162 F.3d 630, 637 (11th Cir. 1998). Those cases essentially support petitioner's argument. However, petitioner has not cited, and the Court is not aware of, any decisions by the Supreme Court of the United States or the Court of Appeals for the Sixth Circuit supporting his argument. Further, this Court is