UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DAVID BRADEN,                                                    Petitioner,

v.                                              Civil Action No. 2:04-cv-842-DJH-RSE
                                                            Judge David J. Hale[1]
                                                  Magistrate Judge Regina S. Edwards

MARGARET BAGLEY, Warden,                                        Respondent.

* * * * *

## MEMORANDUM OPINION AND ORDER

Petitioner David Braden, a prisoner sentenced to death by the State of Ohio, filed this habeas corpus action pursuant to 28 U.S.C. § 2254. Currently before the Court are Petitioner's Second Amended Petition (ECF No. 107),[2] the Brief of Petitioner (ECF No. 59), Respondent's Return of Writ (ECF No. 65), and Petitioner's Reply Brief (ECF No. 68). Following careful review of the parties' filings and the extensive record, the Court will deny the requested relief for the reasons explained below.

### I. Overview

In an earlier order, this Court dismissed as procedurally defaulted the prosecutorial-misconduct claim set forth in Petitioner's eleventh ground for relief. (ECF No. 31-1, at Page ID # 335-338). The Court further held that Petitioner's third and seventh grounds, challenging respectively the trial court's failure to conduct a competency hearing sua sponte and the trial

---

[1] Sitting by designation. (*See* ECF Nos. 114, 115)

[2] All of the Court's references to the Petition will be to the Second Amended Petition (ECF No. 107). Petitioner filed several amended petitions, to which Respondent filed replies, essentially updating Petitioner's method-of-execution claims.

1

court's allowing alternate jurors to be present during deliberations, were subject to procedural default, pending the Court's determination of whether Petitioner could demonstrate cause and prejudice to excuse the default of those claims.[3] (*Id*. at Page ID # 328, 335).

The Court permitted factual development in this case, beginning with granting Petitioner leave to conduct certain discovery. (ECF No. 37). Specifically, the Court allowed Petitioner to depose Dr. Douglas Mossman and Mitigation Specialist James Crates in support of Petitioner's first ground for relief alleging that he was tried while incompetent. (*Id*. at Page ID # 400-405). The Court also allowed Petitioner to depose Mr. Crates in support of Petitioner's fourth ground for relief asserting that his trial counsel were ineffective in failing to ensure Petitioner's competency. (*Id*. at Page ID # 409-410). Finally, the Court permitted Petitioner to depose Attorney Philip Lon Allen in support of Petitioner's thirteenth ground for relief alleging that his trial counsel were ineffective for failing to prepare and present mitigating evidence. (*Id*. at Page ID # 412-414). It was Respondent, not Petitioner, who sought to depose Mr. Allen. Respondent filed notice on February 1, 2008, indicating that Mr. Allen did not appear for his deposition. (ECF No. 44). Pursuant to the Court's March 30, 2007 decision, Petitioner filed the depositions of Mr. Crates and Dr. Mossman on March 24, 2008. (ECF No. 49). The Court subsequently issued an Order allowing Petitioner to supplement the record with any transcripts or documents from the state-court record that had not been filed with the Court. (ECF No. 54). Petitioner filed two exhibits from his state postconviction hearing on July 14, 2009. (ECF No. 60). Finally, on March 31, 2009, the Court issued an Opinion and Order denying Petitioner's motion for an evidentiary

---

[3] It does not appear that Petitioner subsequently offered such arguments as to ground seven. In Petitioner's merits brief, Petitioner stated that any claims not briefed therein were not being pursued. (ECF No. 59, at Page ID # 802). Ground seven was one of the claims not briefed.

hearing, subject to reconsideration should the Court determine that the materials already a part of the record are insufficient to resolve Petitioner's claims. (ECF No. 56, at Page ID # 789-791).

This case is now ripe for review of the grounds for relief that are properly before the Court.

## II. Factual and Procedural History

The details of this capital murder and aggravated robbery are set forth in numerous state-court opinions, including the Ohio Supreme Court's published opinion in *State v. Braden*, 98 Ohio St. 3d 354 (2003):

> In this appeal, defendant-appellant, David L. Braden, raises 15 propositions of law. Finding none meritorious, we affirm his convictions. We have independently weighed the aggravating circumstance in each count against the mitigating factors and compared his sentence to those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm defendant's convictions and sentence of death.
>
> David L. Braden was distraught that his relationship with Denise Roberts might be ending. Roberts resided with her father, 83-year-old Ralph Heimlich, at his Columbus home. Heimlich thought that Braden was a "scumbag" and wanted Roberts to end her relationship with Braden.
>
> On August 3, 1998, Braden showed up at Roberts's workplace and argued with her in the parking lot. They continued to argue following dinner that evening, and Braden damaged Heimlich's car. Later that evening, Braden armed himself and went to Roberts's home. There, he shot Roberts once in the head, and he repeatedly shot Heimlich, killing them both. Braden was convicted of the aggravated murders of Roberts and Heimlich and sentenced to death.
>
> The evidence against Braden included testimony and videotape showing Braden arguing with Roberts at her place of employment, testimony that Braden brandished a pistol prior to the murders, Roberts's complaint filed with police an hour before the murders that Braden had "keyed" her father's car, testimony identifying Braden as the person leaving the crime scene, evidence that Braden did not return to his home until 45 minutes after the murders, and forensic testimony that bullets removed from the victims' bodies were similar to bullets found at Braden's home.

*State's Case*

Shortly after 6:00 p.m. on August 3, 1998, Denise Roberts talked to Victoria Hauser, a co-worker at Merck-Medco in Columbus, about her personal life. According to Hauser, conflict between Braden and Roberts's father was ongoing. Roberts expressed her love for Braden, but Heimlich thought he was a "scumbag." After their conversation, Hauser "demanded that [Roberts] walk out with [her] and that [they] stop and talk with security on the way out" of the building.

Braden was waiting at Merck-Medco to meet Roberts as she left work. Braden had arrived at Merck-Medco's entrance, had told the security guard he "was here to pick his girlfriend up," and had signed his name as "Joe Bob, visitor" on the visitor's log. Braden waited for a few minutes and then went outside.

Roberts had spotted Braden's van in the Merck-Medco parking lot before she left the building, and she asked a security guard to "keep an eye on her as they walked out to their car because she didn't * * * know why her boyfriend was on the property." Roberts declined the security guard's offer for an escort to her car because "she was fearful that that would make [Braden] angry." However, parking lot surveillance cameras were directed on Braden's van, and a security vehicle followed Roberts and Hauser while they walked to Roberts's car.

Braden pulled up his van to block Roberts and Hauser while they were walking towards the parking lot. Braden said, "Hi baby," and told Roberts that he wanted to talk to her. Roberts was "terrified." She told Braden that Hauser "was walking [her] to her car because Roberts had something in her car that she wanted to give to Hauser." Braden told Roberts that "he would follow her to the car," and told Hauser to "get the fuck out of here, I want to talk to my girlfriend * * * ."

The guard in the security vehicle approached Braden after observing him talk to the two women. Upon being approached, Braden said, "What is this? What do I look like? I'm her boyfriend. Do I look like a murderer?" Roberts agreed that Braden was her boyfriend, and the security guard resumed driving around the parking lot to make sure there was no physical violence.

Roberts drove Hauser back to the front of the building, and Hauser returned to work. Before leaving, Hauser told Roberts, "Please come to my house, don't go home, don't get out of your car, don't talk to him, he's going to kill you." Surveillance footage shows that Braden and Roberts got out of their cars, had an "intense" conversation, and then returned to their vehicles and left the parking lot.

At approximately 7:30 p.m., Roberts was at Braden's home on Acton Road in Columbus. Shawn Craddock was visiting his mother, Braden's next-door neighbor, and heard Roberts and Braden arguing. Craddock overheard Braden say,

4

"This was bullshit," although he did not hear what else they said. Roberts was later heard getting into her car and pulling out of Braden's driveway.

Sometime between 8:00 p.m. and 9:30 p.m., Roberts went to a police substation and reported that Braden had damaged her car. Officer Michael Tucker described her as "kind of hysterical" and said, "I could tell she had been crying because some of her makeup was running down her face a little bit." Roberts reported that "she had just gotten in an argument with her boyfriend and that he had keyed up her car." Roberts recounted events leading up to this incident, saying "that [Braden] had showed up at her work and that they had talked a little bit, and he had talked her into going to dinner. She * * * went back to his house, and they got into another argument. She said she got in her car, he wanted to get inside the car and couldn't, and that is when he scratched the car up."

Officer Tucker did not take an incident report since the car was in her father's name. Roberts was advised to have her father call the police station and have a report taken then. After they had finished talking, Tucker viewed the damage, which "appeared to be scratch marks from * * * a key or something like that on the hood and on the side of the door and on top of the car." Roberts then returned home, and Officer Tucker drove "towards [Braden's] house, to see if [he] could either see him outside or * * * , maybe talk to him about it."

Between 9:30 and 9:45 p.m., Craddock was backing his car out of his mother's driveway and saw Braden "standing in the center window * * * and it appeared * * * that he was pointing a gun at" Craddock. Craddock drove to the nearest pay phone and called the police. At around 10:00 p.m., Craddock called his mother, who said, "He's just now leaving."

After calling the police, Craddock pulled his van behind Officer Tucker's police cruiser as it was parked on Acton Road. Craddock reported that Braden had just pointed a firearm at him. He also reported that "he had trouble with [Braden] in the past, * * * [and] every time he gets into it with his girlfriend, he basically goes crazy."

At 9:53 p.m., Roberts called Marion Orr, a police dispatcher, requesting that the police come to her home to take a report on Braden's "keying" of her father's car. Since this was not a high priority incident, the police did not immediately dispatch a cruiser to Heimlich's residence.

Roberts and Heimlich lived on Barthel Road in east Columbus. Shortly after 10:00 p.m., Irvin Ringler II, who lived across the street, heard "five pops" sequenced as "three quick ones followed by a pause, and then another one, a pause, and then another pop." Ringler went outside and saw a man wearing a red shirt and blue jeans walking across a lawn. At the same time, Judith Gall, Heimlich's next

door neighbor, heard noises that "sounded like a hammer hitting an aluminum garage door."

At about the same time, Patricia Cooper, who also lived on Barthel Road, was picking up her dog at her mother's nearby home when she heard "popping sounds." As Cooper approached her house, she saw a man with a reddish shirt walking down Heimlich's driveway, and "his left hand was shielding his face with his face facing down to the ground."

Charlotte Proctor, who lived across from Heimlich, also heard noise outside and went to investigate. Proctor noticed that all of Heimlich's exterior lights were on. After a few minutes, Proctor saw a man in a red tee-shirt and with a ponytail walk from the back of Heimlich's home, open and close the gate, walk down the street to a parked van, and drive away.

Proctor and Gall discovered Roberts's and Heimlich's bodies after entering Heimlich's home through an open front door. Columbus police officers arrived at the scene after Proctor and Gall called 911.

Police officers found Roberts's body lying towards the back of Heimlich's house near a box of spilled kitty litter. Heimlich's body was lying in the kitchen. The police found no sign of forced entry or evidence of theft in the house. Police found an expended .38 caliber nyclad-coated bullet on the living room floor and found a similar .38 caliber bullet lying on the kitchen floor near Heimlich's body. A nyclad-coated bullet is a lead bullet with a nylon coating over the lead surface. A firearms expert noted that out of 150 to 200 sets of bullets he examines in a given year, "no more than * * * five to ten" are nylon-coated bullets.

A telephone answering machine tape that was recovered from the crime scene revealed this message: "Denise, call me, please call me now, please call me now, please! This is David, please call me now!" Phone records showed that at 9:35 p.m. on August 3, 1998, a phone call was made from Braden's home phone to Roberts's home phone.

Examination of Heimlich's car showed fresh scratches on the hood, roof, trunk, and passenger side of the vehicle. Police found fingerprints of Braden's left middle and left ring fingers on the right windshield pillar of the car.

Neighbors provided the police with the suspect's description and identification of his blue van. Meanwhile, Orr heard reports on the police radio about the shooting deaths of two people on Barthel Road, and upon remembering the earlier call from that address, provided police with Braden's name and address.

Sometime after 10:30 p.m., a police helicopter flew over Braden's home looking for his blue van. The officer did not spot his blue van, and the helicopter continued to fly over Braden's house every fifteen minutes. At 11:31 p.m., the officer spotted the blue van parked outside Braden's home.

At approximately 11:30 p.m., officers from the Columbus special weapons and tactics ("SWAT") team went to Braden's home. Braden's van was parked at the house, and the hood was warm, indicating that it had been running recently. Braden was spotted through a bathroom window in the back of the house toweling off after a shower.

SWAT members took Braden into custody, but Braden did not act surprised when the police arrived. He appeared "very casual, very nonchalant," and he had wet hair. Braden's mother was in the house along with two dogs. Police secured the scene and began collecting evidence from Braden's home.

Police found Braden's red shirt inside the washing machine. No firearms were found at either Heimlich's or Braden's home. However, police found a box containing 44 nyclad-coated .38 caliber bullets in Braden's bedroom desk. Six shells were missing from the box of 50 bullets.

The police recovered white particles that appeared to be kitty litter from the driver's seat of Braden's van. However, no lab analysis was conducted to confirm that these particles were kitty litter.

At approximately 2:30 a.m. on August 4, 1998, Proctor was escorted to Braden's home, where she identified Braden as the man she observed leaving Heimlich's residence. However, Proctor told police that "she had a problem with his hairstyle viewing him on Acton. She stated that the individual she saw leaving Barthel had a ponytail at the time, and when she viewed defendant at the Acton address, his hair was down, it was not in a ponytail."

Dr. Keith Norton, a Franklin County Deputy Coroner, found that Roberts had died from a single gunshot to the head. Bullet fragments removed from Roberts's head were found from a nyclad-coated .38 caliber bullet. According to Norton, Heimlich died from gunshot wounds to the chest, eye, and neck. Altogether, Heimlich was shot four times, and a fifth bullet may have grazed his shoulder. Heimlich had also been shot with nyclad-coated .38 caliber bullets.

*Defense Case*

The defense introduced hiking boots and shoes taken from Braden's home on August 3, 1998. Additionally, stipulated expert testimony and a lab report were

7

introduced showing that no blood was found on the hiking boots, shoes, socks, undershorts, pants, and shirt seized from Braden's residence.

### *Trial Result*

A grand jury indicted Braden on two counts of aggravated murder. Count I charged Braden with the aggravated murder of Denise Roberts with prior calculation and design. Count II charged Braden with the aggravated murder of Ralph Heimlich with prior calculation and design. Both counts included a "course of conduct" death penalty specification pursuant to R.C. 2929.04(A)(5) and a firearms specification. The jury convicted Braden as charged and recommended the death penalty on each count. The trial court sentenced Braden to death on each count, three years' confinement on the firearms specifications, and a $50,000 fine.

*Braden*, 98 Ohio St. 3d at 354-59.

Represented by two new attorneys, W. Joseph Edwards and Brian Rigg, Petitioner filed an amended notice of appeal on August 16, 1999. (App. Vol. 2, at 244-245). In an appellate brief filed on April 3, 2000, counsel raised fifteen propositions of law. (App. Vol. 3, at 38-160). On April 2, 2003, the Ohio Supreme Court issued a decision rejecting Petitioner's propositions of law and concluding that Petitioner's death sentence was appropriate and proportionate. *Braden*, 98 Ohio St. 3d at 354. The United States Supreme Court denied certiorari on October 6, 2003. *Braden v. Ohio*, 540 U.S. 865 (2003); App. Vol. 3, at 277.

Represented by the Office of the Ohio Public Defender and Assistant Ohio Public Defender Richard Vickers, Petitioner on June 2, 2000, filed a postconviction petition in the trial court raising thirteen grounds for relief. (App. Vol. 4, at 30-72). After conducting an evidentiary hearing on April 19, 2002, and considering post-hearing briefs, the trial court issued a decision on August 2, 2002, denying Petitioner's claims and dismissing his postconviction action. (App. Vol. 5, at 186). The court of appeals issued a decision on June 10, 2003, affirming the trial court's decision. (App. Vol. 7, at 115). And on October 15, 2003, the Ohio Supreme Court issued an order declining to

accept jurisdiction over Petitioner's appeal from the court of appeals' decision.  (App. Vol. 8, at 159).

### III. Standards for Habeas Review

Provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA) which became effective prior to the filing of the instant petition apply to this case.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  Under the AEDPA, a federal court shall not issue a writ of habeas corpus on a claim that the state courts adjudicated on the merits unless the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).  Section 2254(d)(1) circumscribes a federal court's review of claimed legal errors, while § 2254(d)(2) places restrictions on a federal court's review of claimed factual errors.

Under § 2254(d)(1), a state-court decision is "contrary to" Supreme Court precedent "when the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent" or "when the state court 'applies a rule that contradicts the governing law set forth in' Supreme Court cases." *Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406-07 (2000)).  A state-court decision involves an unreasonable application of Supreme Court precedent if the state court identifies the correct legal principle from the decisions of the Supreme Court but unreasonably applies that principle to the facts of the petitioner's case.  *Id*.  A federal habeas court may not find a state adjudication to be "unreasonable" merely because the federal court concludes

in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. *Id*. Rather, a state court's application of federal law is unreasonable "only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible credible outcomes." *Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999). Further, § 2254(d)(2) prohibits a federal court from granting an application for habeas relief on a claim that the state courts adjudicated on the merits unless the state courts' adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

The Supreme Court has clarified that in making the § 2254(d)(1) determination, a federal court in habeas corpus must confine its review to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011). Courts have since held that *Pinholster* logically applies to any § 2254(d)(2) determination as well. *See, e.g.*, *Sanders v. Curtin*, 529 F. App'x 506, 517 n.5 (6th Cir. 2013) ("Although *Pinholster* specifically addressed subsection (d)(1), subsection (d)(2), by its terms, also requires a federal court to limit its review to the record that was before the state court.").

### IV. Petitioner's Claims[4]

Petitioner's first four grounds concern his central claim that he was legally incompetent in the months leading up to and during his trial. In his first ground for relief, Petitioner argues that

---

[4] As the Court noted earlier, Petitioner stated in his merits brief that claims not briefed were claims he was no longer pursuing. (ECF No. 59, at Page ID # 802). Petitioner's merits brief did not include claim six, seven, nine, ten, eleven, or twelve. (*Id.*). Accordingly, the Court regards those claims as abandoned and will dismiss them with prejudice.

he was tried and sentenced while incompetent.  He charges in his second ground for relief that he was deprived during state postconviction proceedings of the opportunity to develop his competency claim. His third ground for relief argues that the trial court erred in failing to conduct a competency hearing sua sponte prior to trial.  Finally, in his fourth ground for relief, Petitioner argues that his attorneys rendered ineffective assistance by failing to protect his right to be competent at trial.

It does not appear that grounds two and three are properly before the Court.  With respect to Petitioner's second ground for relief, in which Petitioner alleges that he was denied the opportunity to litigate his competency claim in his state postconviction proceeding, the Court noted in its March 30, 2007 Opinion and Order addressing discovery that this claim did not appear to be cognizable in habeas corpus.  (ECF No. 37, at Page ID # 405-407).  The Supreme Court has since ruled that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel if, in the initial-review collateral proceeding [postconviction in Ohio], there was no counsel or counsel in that proceeding was ineffective."  *Martinez v. Ryan*, 566 U.S. 1, 17 (2012).  The Court is not persuaded, however, that *Martinez*'s implicit recognition of the importance of state collateral review goes so far as to elevate to a constitutional dimension every claim alleging a denial of due process in postconviction.  That would eviscerate the long-standing principle in the Sixth Circuit, stemming from *Pennsylvania v. Finley*, 481 U.S. 551 (1987), that "errors in post-conviction proceedings are outside the scope of federal habeas corpus review."  *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007).  This Court declines to extend *Martinez* in such a sweeping manner.

As for Petitioner's third ground for relief, in which he alleges that the trial court erred to his prejudice in failing to conduct a competency hearing sua sponte, the Court held in its March 30, 2006 Opinion and Order addressing procedural default that this claim appeared to be barred by procedural default, unless Petitioner could subsequently demonstrate cause and prejudice to excuse the default.  (ECF No. 31-1, at Page ID #324-328).  Petitioner advanced cursory arguments in his July 14, 2009 Brief, which the Court finds unpersuasive.  (ECF No. 59 at Page ID # 847).

Because these first four grounds share a common set of facts, the Court sets forth those facts below, quoting from the March 31, 2009 Opinion and Order addressing Petitioner's motion for an evidentiary hearing:

> According to the petition, although Petitioner appeared fine to defense trial counsel Thomas Beal during their initial visits between September and December 1998, Petitioner's mental condition appeared to Mr. Beal to deteriorate after that.  The petition states that Mr. Beal made the trial court aware of his concerns about Petitioner's mental health, prompting the trial court to expand the role of Dr. Kathleen Burch from just examining Petitioner in preparation for the mitigation phase of his trial to additionally examining Petitioner for the purpose of assessing his competency to stand trial.  Following four evaluations, the petition continues, Dr. Burch found Petitioner competent to stand trial because, although Dr. Burch harbored concerns about Petitioner's delusional belief that he was a prophet of God, that he would be spared from his capital case by God, and that certain weather occurrences and other current events were related to his case, Dr. Burch was never made aware or otherwise had reason to believe that Petitioner was not communicating and cooperating with his defense attorneys.  According to the petition, Mr. Beal's personal trial notes, which were not revealed until Petitioner's postconviction proceedings, demonstrated that Petitioner in fact had not been able [or willing] to cooperate with or otherwise assist his trial attorneys during the case.

> Petitioner filed a postconviction action in the state trial court alleging, among other things, that he had been tried while incompetent.  In support of that claim, he submitted an affidavit by Dr. Douglas Mossman, who had evaluated Petitioner some eight months after Petitioner's trial and concluded that Petitioner's "mental illness substantially compromised his understanding of the proceedings against him and his ability to consult with his lawyers in preparing his defense." (App. Vol. 4, at 96).  Also submitted were two notes that Petitioner had passed to defense counsel, one during a pretrial hearing and the other during the trial phase,

12

essentially stating that, according to God, Petitioner was to be given a full pardon, new identity, travel credentials, and money. (App. Vol. 4, at 115-117).

After reviewing Petitioner's postconviction action and supporting exhibits, the trial court issued an order setting the matter for an evidentiary hearing "on the issue of Petitioner's mental status at the time of the trial, as well as at the time these acts occurred." (App. Vol. 5, at 65). The trial court stated in its order that it "expect[ed] to hear testimony, at a minimum, from the following individuals: Dr. Douglas Mossman; Dr. Kathleen J. Burch; Thomas D. Beal, Esq.; P. Lon Allen, Esq.; and James Crates." (*Id.*) The trial court conducted the evidentiary hearing on April 19, 2002. Petitioner called two witnesses, defense attorney Thomas Beal and defense psychologist Dr. Kathleen Burch, and presented as exhibits notes that Mr. Beal took during his jail visits with Petitioner, the two notes that Petitioner had passed to defense counsel, Dr. Burch's notes from her sessions with Petitioner, and an affidavit by Dr. Burch regarding her opinion as to Petitioner's mental state at the time of the offense.

Following the testimony of Mr. Beal and Dr. Burch, Petitioner was prepared to call Dr. Mossman as a witness. Petitioner did not call Dr. Mossman, after the trial court stated on the record that it had thoroughly considered Dr. Mossman's affidavit, that it was not sure what Dr. Mossman could add, and that it was not sure that it wanted to hear from him. (Evid. Hrg. Tr., at 107-108). Petitioner stated in his motion for discovery that he had also subpoenaed and was prepared to call co-counsel P. Lon Allen and mitigation specialist Jim Crates (Doc. # 32, at 8); but neither testified and the transcript of the evidentiary hearing contains no indication of why Petitioner did not call them.

The parties filed their post-hearing briefs on May 10, 2002. On August 2, 2002, the trial court issued a decision and entry denying Petitioner's postconviction action. (App. Vol. 5, at 186). Regarding Petitioner's claim that he was tried while incompetent, the trial court declined to consider the affidavit by Douglas Mossman, M.D., citing primarily the fact that Dr. Mossman's evaluation of Petitioner's competency to stand trial had taken place some eight months after the trial (App. Vol. 5, at 200). The trial court also determined that Dr. Burch's "changed opinion" of Petitioner's incompetence was not credible (App. Vol. 5, at 205) and concluded that Petitioner's claim, accordingly, could have been raised on direct appeal and was therefore barred under Ohio's doctrine of *res judicata* (App. Vol. 5, at 205-206). The Ohio Court of Appeals for the Tenth Appellate District affirmed the trial court's rationale for applying the *res judicata* doctrine against Petitioner's competency claim, and added that, "even if the trial court would have accepted both Drs. Burch and Mossman's opinions, we agree that res judicata could be applied under the present circumstances." (App. Vol. 7, at 123).

(ECF No. 56, at Page ID # 781-784).


**Ground One:  Petitioner's Competence to Stand Trial.**

**Parties' Arguments**

Petitioner argues in his first ground for relief that he was tried while incompetent in violation of rights guaranteed him by the Sixth, Eighth, and Fourteenth Amendments to the Constitution.  (Second Amended Petition, ECF No. 107, at Page ID # 5387-5397; ECF No. 59, at Page ID # 813-834).  The crux of Petitioner's claim, as expanded upon in his July 14, 2009 Brief (ECF No. 59), is that Petitioner's mental state severely deteriorated from approximately December 1998 or January 1999 until and during his April/May 1999 trial but that the full extent and legal effect of Petitioner's mental state was not fully known until beginning with his April 19, 2002 state postconviction hearing and culminating with these habeas corpus proceedings.  As summarized in Petitioner's July 14, 2009 Brief:

> Braden was genuinely incompetent when his case went to trial.  Braden's thoughts, presentation and behaviors were consistent with everyone who had contact with him.  Braden's delusion-based belief in the goals of the justice system is not the rational understanding of the proceedings required by <u>Dusky</u>.  <u>Lafferty v. Cook</u>, 949 F.2d 1546 (10th Cir. 1991).  There has been a complete convergence of testimony and records from the trial, post-conviction evidentiary hearing and depositions in federal proceedings, pointing to the irrefutable conclusion that Braden was tried while incompetent.  Only the aid of antipsychotic medication not administered until long after the trial has been effective to allow Braden to emerge from a pervasive, delusional state.  The evidence established beyond a preponderance that Braden was unable to rationally understand the proceedings around and against him, or rationally consult with his lawyers.  <u>Dusky</u>, 362 U.S. at 402.  Braden was not competent when he stood trial and therefore, this Court should grant Braden the writ.

(ECF No. 59, at Page ID # 834).

Petitioner begins his arguments by recounting the evidence and testimony he presented during state-court postconviction proceedings.  (ECF No. 59, at Page ID # 813-822).  Petitioner supported his postconviction petition with the affidavit of Dr. Douglas Mossman and the two notes

**Ground One:  Petitioner's Competence to Stand Trial.**

**Parties' Arguments**

Petitioner argues in his first ground for relief that he was tried while incompetent in violation of rights guaranteed him by the Sixth, Eighth, and Fourteenth Amendments to the Constitution.  (Second Amended Petition, ECF No. 107, at Page ID # 5387-5397; ECF No. 59, at Page ID # 813-834).  The crux of Petitioner's claim, as expanded upon in his July 14, 2009 Brief (ECF No. 59), is that Petitioner's mental state severely deteriorated from approximately December 1998 or January 1999 until and during his April/May 1999 trial but that the full extent and legal effect of Petitioner's mental state was not fully known until beginning with his April 19, 2002 state postconviction hearing and culminating with these habeas corpus proceedings.  As summarized in Petitioner's July 14, 2009 Brief:

> Braden was genuinely incompetent when his case went to trial.  Braden's thoughts, presentation and behaviors were consistent with everyone who had contact with him.  Braden's delusion-based belief in the goals of the justice system is not the rational understanding of the proceedings required by <u>Dusky</u>.  <u>Lafferty v. Cook</u>, 949 F.2d 1546 (10th Cir. 1991).  There has been a complete convergence of testimony and records from the trial, post-conviction evidentiary hearing and depositions in federal proceedings, pointing to the irrefutable conclusion that Braden was tried while incompetent.  Only the aid of antipsychotic medication not administered until long after the trial has been effective to allow Braden to emerge from a pervasive, delusional state.  The evidence established beyond a preponderance that Braden was unable to rationally understand the proceedings around and against him, or rationally consult with his lawyers.  <u>Dusky</u>, 362 U.S. at 402.  Braden was not competent when he stood trial and therefore, this Court should grant Braden the writ.

(ECF No. 59, at Page ID # 834).

Petitioner begins his arguments by recounting the evidence and testimony he presented during state-court postconviction proceedings.  (ECF No. 59, at Page ID # 813-822).  Petitioner supported his postconviction petition with the affidavit of Dr. Douglas Mossman and the two notes

Petitioner had passed to his defense counsel during trial.  Based on that petition and evidence, the state court conducted an evidentiary hearing three years after Petitioner's trial.  Petitioner called defense counsel Tom Beal and mitigation psychologist Kathleen Burch and submitted as evidence notes taken by Mr. Beal and Dr. Burch during their visits with Petitioner, as well as Petitioner's pretrial jail records.

According to Petitioner, "[t]he most pertinent and clear evidence of Braden's mental decline are the notes of his attorney, Mr. Beal, written in the interview room with Braden." (ECF No. 59, at Page ID # 814).  Petitioner recounts examples of bizarre statements that Petitioner began making to Mr. Beal in January 1999, when Mr. Beal was attempting to discuss the case with Petitioner.  "At this point," Petitioner explains, "Mr. Beal went to the court to express his concerns that Braden might not be competent to proceed."  (*Id*. at Page ID # 815).  The trial court subsequently granted Mr. Beal's request to allow the psychologist who was already evaluating Petitioner for mitigation purposes to additionally monitor Petitioner for competency.  Petitioner continues that "Mr. Beal's frustration at Braden's inability to cooperate in his defense, or even communicate in a minimally rational manner with his lawyers, led Mr. Beal to consult with the mitigation specialist, Jim Crates, and Dr. Burch regarding how to handle his obviously delusional client."  (*Id*.)  Petitioner also states, however, that from the time this apparent decompensation began in January 1999 and continued through trial, "Mr. Beal, while dutifully monitoring his client's condition in the jail, did not inform Dr. Burch directly that Braden was no longer communicating with him about the case."  (*Id*. at Page ID # 816).

Petitioner next explains the circumstances surrounding the two handwritten notes that he passed to defense counsel.  First, according to Petitioner, during or immediately prior to an April

9, 1999 pretrial hearing, Petitioner handed Mr. Beal a note warning of dire consequences if Braden were not freed and citing a recent tornado as a warning from God. The note also requested a new passport and identity, honorary degrees, airline passes, thirty million dollars, traveling clothes, and luggage. Petitioner states that Mr. Beal told his co-counsel about the note, alerted the trial court to the note, and probably through Jim Crates made Dr. Burch aware of the note. It does not appear, however, that Mr. Beal showed the note to Dr. Burch or described in detail the content of that note. (*Id*.)

During the trial, Petitioner passed another handwritten note to his defense counsel, this time requesting that U.S. Diplomat status be added to Petitioner's passport and explaining that the monetary compensation due to Petitioner was now 100 million dollars. Petitioner states that "[d]efense counsel did not make the court or Dr. Burch aware of this second note." (*Id.* at Page ID # 816-817).

Petitioner next sets forth the details of Dr. Burch's postconviction testimony—specifically about how Dr. Burch had changed her opinion as to Petitioner's competence. (*Id*. at Page ID # 817-819). Dr. Burch met with Petitioner on four occasions, the first of which took place on October 30, 1998, and the final of which occurred just weeks before Petitioner's trial began in April 1999. Although she was initially retained to evaluate Petitioner for his mitigation hearing, Dr. Burch was alerted on February 4, 1999, by Jim Crates "that Mr. Crates, Mr. Beal, and Braden's brother were reporting that Braden's behavior had become more disturbingly bizarre as of late." (*Id*. at Page ID # 817).

"After each evaluation," Petitioner continues, "Dr. Burch rendered her opinion to the defense team that Braden was competent to stand trial." (*Id*. at Page ID # 818). Dr. Burch also

16

ultimately testified at Petitioner's mitigation hearing that Petitioner was competent. Petitioner

stresses that Dr. Burch's opinion was a "close call" and was conditioned on the fact that she "did

not have any further information from his defense team about his being unable to cooperate with

them." (*Id.*, quoting Tr. Vol. IX, at 179).

During the postconviction hearing three years later, Dr. Burch changed her opinion and

testified that Petitioner was not competent to stand trial. Petitioner explains:

> Once Dr. Burch was shown additional information, the 2 letters that Braden gave
> to his attorneys during pretrial and trial, she testified that based on all of the
> information, now known to her, Braden had not been competent when he stood
> trial. PC Hg. Tr. 76, 87-88, 103. Dr. Burch concluded that Braden had not been
> able to assist his attorneys at trial – this was the missing piece of information that
> she needed for a finding of incompetence, but she hadn't received this information
> before the time of trial. PC Hg. Tr. 105.

(ECF No. 59, at Page ID # 818).

Petitioner next points to certain jail records as evidence of his mental deterioration

beginning in January 1999 and worsening up to and during his trial in April/May 1999. (*Id*. at

Page ID # 819-820). "The very first indication of Braden's decompensation," Petitioner asserts,

"was memorialized in the jail records and is a Statement of Witness dated January 12, 1999." (*Id*.

at Page ID # 819). In that statement, a cellmate named Joseph Bains expressed concerns about

increasingly bizarre statements and behavior on Petitioner's part. Petitioner also points to records

documenting a May 3, 1999 incident involving Petitioner's leg brace, during which Petitioner told

deputies that he was clairvoyant, capable of astral travel, and capable of remote viewing. (*Id*. at

Page ID # 820).

Petitioner stresses that although his postconviction hearing constitutes a "retrospective

evaluation" of his mental status at the time he stood trial, sufficient contemporaneous evidence

exists of his mental state during that time to give legitimacy to the retrospective determination. (*Id*. at Page ID # 820-822).

Petitioner next turns his attention to evidence that he presented or developed during these habeas corpus proceedings. (*Id*. at Page ID # 822-833). Specifically, Petitioner describes in detail the observations and opinions of Dr. Douglas Mossman and mitigation specialist Jim Crates. Dr. Mossman evaluated Petitioner twice in 2000 and reviewed a host of materials, submitted an affidavit in support of Petitioner's postconviction petition, and was prepared to but ultimately did not testify at Petitioner's postconviction hearing. Mr. Crates, leading up to the trial, had frequent interactions with Petitioner, as well as communication with defense counsel and Dr. Burch. Mr. Crates was likewise prepared to testify at Petitioner's postconviction hearing but ultimately did not. Petitioner deposed both witnesses during these habeas proceedings and filed those depositions with this Court. (ECF Nos. 49 and 56). Petitioner argues that this evidence constitutes additional, persuasive, and unrefuted proof that he was incompetent to be tried. (ECF No. 59 at Page ID # 822-834).

Dr. Mossman testified at length during his habeas deposition about the severe mental decompensation that Petitioner suffered in the five months preceding Petitioner's trial. (ECF No. 59, at Page ID # 823-824). Paramount to Dr. Mossman's opinion about Petitioner's disordered thinking during that pretrial period was Dr. Mossman's personal observation of marked improvements in Petitioner's behavior after receiving treatment with antipsychotic medication. (*Id*. at Page ID # 824-825). Dr. Mossman also testified about test results and other indicia undermining the possibility that Petitioner had been "malingering" or exaggerating his symptoms. (*Id*. at Page ID # 825-826). With respect to Dr. Burch's "changed opinion," Dr. Mossman testified

18

that Dr. Burch had been mistaken when she testified at Petitioner's mitigation hearing that Petitioner was competent, but that Dr. Burch had not had available to her critical information that Dr. Mossman had available to him—such as the detailed content of the two notes Petitioner had passed to defense counsel during trial, Mr. Beal's notes from his pretrial meetings with Petitioner, and observations of Petitioner after he received antipsychotics. (*Id*. at Page ID # 826-827). Finally, Dr. Mossman explained why the time gap between Petitioner's trial in 1999 and Dr. Mossman's evaluations of Petitioner in 2000 did not diminish the validity or reliability of Dr. Mossman's conclusion that Petitioner was incompetent at trial. (*Id*. at Page ID # 827).

Defense counsel retained Jim Crates in September 1998 to conduct mitigation investigation and preparation. Mr. Crates testified that he met with Petitioner every four to six weeks from that time through December 1998. (*Id*. at Page ID # 828). In January or February 1999, Mr. Beal asked Mr. Crates to visit Petitioner because Petitioner "was saying some very bizarre things." (*Id*. at Page ID # 829). According to Petitioner's account of Mr. Crates's testimony, "Mr. Beal wanted to know if Braden would say the same things to Mr. Crates and whether Dr. Burch needed to see Braden as well." (*Id*.) Mr. Crates proceeded to detail observations of Petitioner's statements and behavior that were similar to those noted by Dr. Burch and Mr. Beal. (*Id*.) Petitioner states that from January through April or May 1999, Mr. Crates met with Petitioner less frequently and for shorter durations of time because Petitioner's persistent delusional statements made the meetings unproductive.

Petitioner next offers arguments and examples of the shortcomings in communication between the defense team that he asserts essentially allowed Petitioner to be tried while incompetent. (*Id*. at Page ID # 830-831). "At [team] meetings," Petitioner explains, "the

19

discussion was predominantly about the preparation for the mitigation phase of the case," and "Braden's competency was only discussed in a cursory way." (*Id*. at Page ID # 830). Petitioner continues that "[t]he insufficient dialogue consisted of Mr. Crates or Mr. Beal simply asking Dr. Burch whether Braden was competent and Dr. Burch replying that Braden has a major mental illness but she thought he was competent." (*Id.*). Missing from the meetings, Petitioner emphasizes, was any in-depth dialogue about his interactions with Mr. Crates or Mr. Beal or, specifically, his inability to cooperate with defense counsel or Mr. Crates. (*Id.*).

"What was really going on with Braden following his arrest and through the trial," Petitioner stresses, "was not known until the post-conviction evidentiary hearing." (*Id*. at Page ID # 832). To that point, Petitioner asserts that this Court owes no deference to the opinion of the last court to address Petitioner's claim—the Ohio Tenth District Court of Appeals. According to Petitioner, "[t]he Court of Appeals' opinion involves an unreasonable determination of the facts in light of the evidence presented." (*Id*. at Page ID # 833). Petitioner also asserts that "[w]ith respect to 28 U.S.C. § 2254(d)(1), the Court of Appeals never made an actual determination of Braden's competency pursuant to the clearly established federal law found in Dusky v. United States, 362 U.S. 402 (1960)." (*Id.* at Page ID # 834).

Respondent asserts that Petitioner's first claim is without merit and that "Braden cannot show that the Ohio Tenth District Court of Appeals unreasonably applied *Drope v. Missouri*, 420 U.S. 162, 183 (1975), *Pate v. Robinson*, 383 U.S. 375 (1966), or *Dusky v. United States*, 362 U.S. 402 (1960)." (ECF No. 65, at Page ID # 922). Respondent proceeds to argue that "[c]ontrary to Braden's arguments, *Pate* and *Drope* are distinguishable from the present case." (*Id.*) Respondent explains:

In *Pate*, the trial court never held a competency hearing even though four experts had declared Pate to be insane. In the present case, Braden's own expert (Dr. Burch) found him competent to stand trial. In *Drope*, the trial court refused to conduct a competency hearing even though the defense requested it, the prosecution agreed, and the defendant had recently attempted suicide. In the present case, Braden's attorneys requested, and were granted, funds to have their own expert evaluate Braden for competency. Defense counsel chose this option, as opposed to competency hearing evaluation, because they wanted to prevent the State from obtaining a copy of any expert reports. Thereafter, Dr. Burch, the defense's expert, after several meetings with Braden, found him competent to stand trial.

(*Id*. at Page ID # 922-923).

Respondent asserts, in direct opposition to Petitioner's argument, that the state postconviction evidentiary hearing, along with the trial record, demonstrates that Braden *was* competent to stand trial. Respondent argues that Petitioner's claims of an onset in January 1999 of delusional thinking and paranoia are undercut both by the fact that his brother and sister-in-law testified that Petitioner had been making such statements for years prior to the murders and the fact that, while making those statements, he functioned as the sole caretaker for his incapacitated mother for more than five years. (*Id*. at Page ID # 923).

As further evidence undermining the assertion of a recent descent into incompetency, Respondent notes that defense attorney Tom Beal met often with Petitioner, monitored his competency, deliberately elected not to request a competency hearing, and testified at the postconviction hearing that Petitioner had communicated appropriately with his defense attorneys. As to Mr. Beal's recounting of his interactions with Petitioner, Respondent explains:

From the very beginning, Braden claimed that he had no memory of the crime. In fact, Braden told Beal that he was home asleep during the murders. (Evid. Hrg. pg. 41). According to Beal, Braden never refused to discuss the case. (Evid. Hrg. pg. 37-39). In October of 1998, Beal and Braden discussed the case at length, came up with a defense strategy, and discussed the witnesses he knew. (Evid. Hrg. pg. 43, 49; Ex. 1—10/21 & 12/1 notes). According to Beal, their strategy, from the beginning, was to keep Braden from being executed. (Evid. Hrg. pg. 43). Beal

21

> acknowledged "we didn't really have any chance at all to win at the guilt phase."
> (Evid. Hrg. pg. 43). Per Beal, his investigator spoke to the witnesses, and the
> defense team had a pretty solid grasp of the State's case against Braden. (Evid.
> Hrg. pg. 43-44).

(*Id*. at Page ID # 924).

Respondent further notes that Dr. Burch met with Petitioner and monitored his competency. She admitted on cross-examination during the postconviction hearing that her notes reflect that Petitioner understood his attorneys defended him in court and that the prosecution had to prove that Petitioner "did it." (*Id*.) Respondent emphasizes that having administered a battery of tests, having met with Petitioner four times between October 1998 and April 1999, having learned from Petitioner's brother and sister-in-law about Petitioner's history of mental problems, and having been made aware of the note Petitioner passed to defense counsel at an April pretrial hearing about getting a new identity, millions of dollars, and traveling needs, Dr. Burch repeatedly concluded that Petitioner was competent to stand trial. (*Id.* at Page ID # 924-929).

Respondent notes that Mr. Beal stated on the record at trial that Dr. Burch had monitored Petitioner and that defense counsel would *not* be raising the issue of competency. (*Id.* at Page ID # 928). Respondent also asserts, contrary to Petitioner, that Dr. Burch's notes actually show that Petitioner *was* competent. (*Id*. at Page ID # 929-931). Respondent then notes that at the mitigation hearing, Dr. Burch testified that Petitioner, although mentally ill, was competent. (*Id*. at Page ID # 931-932).

Respondent charges that the claimed basis of Dr. Burch's about-face—the second note that Petitioner passed to defense counsel during trial—was a mere pretext to her simply changing her mind after the fact. Respondent thus characterizes as reasonable the finding by the trial court that Dr. Burch lacked credibility. (*Id.* at Page ID # 932-933). Respondent further offers as reasonable

22

the trial court's observation during postconviction that Petitioner had appeared reasonable and lucid during the trial and finding that Dr. Mossman's *nunc pro tunc* opinion was not credible. (*Id*. at Page ID # 934-935).

"The Ohio Tenth District Court of Appeals," Respondent continues, "rejected Dr. Burch's changed opinion, disregard[ed] Dr. Mossman's *nunc pro tunc* opinion, and affirmed the trial court's finding that Braden was competent at trial." (*Id*. at Page ID # 935). Respondent then asserts that although the appellate court held that Petitioner's claim was barred by res judicata, its alternative holding rejecting Petitioner's claim on the merits is entitled to deference under 28 U.S.C. § 2254(d). (*Id*. at Page ID # 939 (citing *Brooks v. Bagley*, 513 F.3d 618, 624-25 (6th Cir. 2008)). Respondent further asserts that state-court factual findings enjoy a presumption of correctness rebuttable only by clear and convincing evidence. Respondent concludes that the trial court's credibility determinations, affirmed by the state court of appeals, must be honored and that the state courts' analysis of Petitioner's claim was not an unreasonable application of *Dusky*, *Pate*, and *Drope*. (*Id.* at Page ID # 942). "In the present case," Respondent asserts, "Braden's claim is based solely on the changed opinion of Dr. Burch (which lacks credibility) and the *nunc pro tunc* evaluation conducted by Dr. Mossman." (*Id.*).

To the extent Petitioner also argues that he is entitled to relief under § 2254(d)(2), Respondent asserts that he can prevail only by proving that the trial court's factual finding was unreasonable in light of the evidence presented. (*Id*. at Page ID # 943). Recounting the evidence presented during postconviction and the trial court's decision and entry rejecting Petitioner's claim, Respondent argues that the trial court's finding that Petitioner was competent at trial was reasonable. (*Id*. at Page ID # 944-946).

**State-Court Decisions**

As noted above, Petitioner presented his claim to the state courts in his postconviction petition (App. Vol. IV, at 31-39), supported by nine of the nineteen exhibits he submitted with his current petition (App. Vol. IV, at 75-165). One of those exhibits was an affidavit by psychiatrist Dr. Douglas Mossman, who evaluated Petitioner twice in 2000 and reviewed numerous materials such as previous mental-health evaluations, agency records, and notes from pretrial visits with Petitioner by attorney Tom Beal and psychologist Dr. Burch. (App. Vol. IV, at 75-114). Dr. Mossman's affidavit concludes that Petitioner had, by reason of a severe mental illness, been unable to understand the nature of the proceedings against him or assist his attorneys with his defense. (*Id.*). The state trial court conducted an evidentiary hearing on April 19, 2002.

In an August 2, 2002 Decision and Entry, the trial court denied Petitioner's claim as barred by Ohio's doctrine of res judicata. (App. Vol. V, at 205-06). The trial court began its opinion by making findings of fact that consisted of a recounting of the chronology of the case against Petitioner, Dr. Burch's examinations of Petitioner, Dr. Burch's mitigation testimony, the two notes that Petitioner passed to counsel during trial, Petitioner's interaction with the Court, and the April 19, 2002 evidentiary hearing that the trial court conducted. (*Id*. at 186-98). The trial court then made numerous conclusions of law. Of relevance to the instant issue are the trial court's conclusions that

> [i]n order to prevail [in postconviction], a defendant must establish, based upon evidence outside the record, that "there was such a denial or infringement of the rights of the [defendant] as to render the judgment void or voidable under the Ohio Constitution or the United States Constitution." *State v. Perry* (1967), 10 Ohio St.2d 175, paragraph four (4) of the syllabus.
>
> ***

24

In a post-conviction proceeding the trial court is the trier of fact. O.R.C. §2953.21.

As such, the trial court is in the best position to resolve questions of fact and determine the credibility of witnesses. See *State v. Dunlap* (1995), 73 Ohio St.3d 308, 314; *State v. Fanning* (1982), 1 Ohio St.3d 19, 20.

"The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan* (1986), 22 Ohio St.3d 120, 123.

\*\*\*

While the submission of evidence outside the record in support of a claim may defeat the application of *res judicata*, State v. Carter (November 14, 1987), Hamilton App. No. C960718, unreported, the evidence *dehors* the record must be "competent, relevant, and material evidence…which was not in existence or available for use at the time of the trial." *State v. Gipson* (September 26, 1997), Hamilton App. Nos. C-960867, C-9960881, unreported (citations omitted).

\*\*\*

The Court will not consider Dr. Mossman's Affidavit. [Footnote 1: While case law does not permit the Court to consider Dr. Mossman's Affidavit, the Court did read his Affidavit and is aware of the opinions set forth therein.] Dr. Mossman did not interview Defendant prior to trial or at the time of trial. Instead, Dr. Mossman's first interview with Defendant occurred eight (8) months after the jury's recommendation of death. As such, his opinion, while highly credentialed, is nothing more than a *nunc pro tunc* analysis of whether or not Defendant was competent at the time of trial. This manner of determining competency, as stated in *Harris*, is intrinsically difficult and does not protect Defendant's rights.

Moreover, Dr. Mossman's conclusion that Defendant was incompetent prior to, and during trial, is contrary to Dr. Burch's opinion. [Footnote 1 [sic]: Dr. Burch determined prior to trial, on four (4) separate occasions, that Defendant was competent. As such, Dr. Mossman's conclusion is contrary to Dr. Burch's. Moreover, if the Court were to accept Dr. Burch's changed opinion regarding Defendant's competency, Defendant was still not incompetent until around the time of the Second Note.] The Court will not entertain Defendant's attempt to impeach his own witness with purchased testimony of an "after the fact" nature. To allow Defendant to open this door will result in the exact end the *Harris* court believed trial courts should avoid and which is not guaranteed by the Constitution.

\*\*\*

25

As briefly stated above, the Court does not find Dr. Burch's changed opinion credible.

A review of the evidence reveals to the Court that Dr. Burch has offered inconsistent opinions throughout this litigation.

Dr. Burch clearly testified during the mitigation phase of Defendant's trial that Defendant was not insane at the time of the offense. Furthermore, in mitigation, the dialog between counsel and Dr. Burch provided Dr. Burch with the opportunity to testify to her opinion that Defendant, while legally sane, was unable to conform his behavior to the requirements of the law, if that was her opinion at the time. [Footnote 3: A review of Dr. Burch's mitigation testimony reveals that she expounded upon answers. An example follows:

     Q.     And at the end of the interview, were you still convinced that he was competent:

     A.     Yes. I had – I had some question at that time as to his competence because he was expressing the idea that he believed that God was going to deliver him, that he would never have to go to trial, that God was going to provide him with money and a new identity, and he would somehow be delivered. And that idea, having that belief made me wonder about whether he would really be able to work cooperatively with his defense attorneys in his own self-interest. However, I couldn't substantiate that concern, and he had up to that point been able to work at least adequately with his attorneys. So yes, I concluded that he was still competent. (Testimony of Dr. Burch, Mitigation Phase of Trial, Vol. IX, p. 176).] However, Dr. Burch did not state this opinion.

Notwithstanding, Dr. Burch allowed herself to sign an affidavit which states she would have testified that Defendant was unable to conform his behavior to the law, if only counsel would have asked her.

Finally, during her post-conviction testimony, she changed her competency opinion based, purportedly, upon the contents of the two-line Second Note, which simply discusses Defendant's increased demands, originally set forth in the April 9, 1999 Note.

Dr. Burch was aware of the April 9, 1999 Note at the time she testified during mitigation and still concluded that Defendant was competent.

The Court is unconvinced, when faced with a finding of competency as a result of the compilation of information from four (4) separate interviews with Defendant prior to trial and based upon her knowledge of the contents of the April 9, 1999 Note, that the Second Note had much at all to do with Dr. Burch's changed opinion.

Rather, the Court is of the opinion that Dr. Burch's changed opinion is the result of her second-guessing her original opinion and the Second Note is merely justification for the change.  Regardless of motivations, the Court concludes Dr. Burch's changed opinion is not credible and as such the Court rejects the same.

The issue of Defendant's competency could have been raised on direct appeal.  Dr. Burch testified at length during the mitigation phase about her examinations of Defendant and her opinion that Defendant was competent.  As such, there was sufficient information in the trial record for Defendant to challenge Dr. Burch's opinion that he was competent, which the Court concludes is Defendant's purpose for offering Dr. Mossman's affidavit.

Furthermore, the record contains several instances which memorialize Defendant's behavior during trial.

Further, as the Court will not consider Dr. Mossman's after the fact affidavit and having now concluded that Dr. Burch's opinion is not competent evidence, the evidence *dehors* the record fails to prevent the application of the doctrine of *res judicata*.

(App. Vol. V, at 198-206).

The Ohio Court of Appeals for the Tenth Appellate District affirmed the trial court's

decision.  The appellate court explained in relevant part:

We will address appellant's first, second, and third assignments of error together, as they are related.  Appellant argues in his first assignment of error the trial court erred in determining that he was competent when he stood trial because he could not assist in his defense and did not have a rational understanding of the proceedings against him.  Appellant argues in his second assignment of error the trial court erred in applying res judicata to his claims.  Appellant argues in his third assignment of error the trial court erred in not considering his post-conviction psychiatric evidence.

The appellate standard of review for post-conviction relief under R.C. 2953.08 is de novo.  *State v. Davis* (1999), 133 Ohio App.3d 511, 515.  However, in the interest of providing finality to judgments of conviction, courts construe the post-conviction relief allowed under R.C. 2953.21(A)(1) narrowly.  See *State v. Steffen* (1994), 70 Ohio St.3d 399, 410.  Further, when a trial court rules on a petition for post-conviction relief after a hearing, an appellate court will give deference to the trial court's findings of fact.  See *State v. Jolly* (June 24, 1993), Cuyahoga App. No. 62380.

In denying appellant's petition for post-conviction relief with regard to the issues raised in the first three assignments of error, the trial court: (1) refused to consider Dr. Mossman's affidavit, in which Dr. Mossman averred that appellant was not competent to stand trial based upon his examination eight months after the sentencing; (2) found Dr. Burch's changed opinion was not credible; (3) found the issue of appellant's competency could have been raised on direct appeal; and (4) held that because Dr. Mossman's affidavit could not be considered and Dr. Burch's opinion was not credible, there was no evidence outside the record to prevent the application of res judicata. Thus, we must review the testimony of Dr. Burch and the affidavit of Dr. Mossman.

With regard to Dr. Burch, the trial court found her changed testimony was not credible. Dr. Burch conducted four evaluations of appellant prior to trial and found appellant competent after all four examinations. Dr. Burch claimed at the post-conviction hearing that her opinion changed when she saw the evidence of appellant's communications with his lawyers during trial, specifically the second note. Although she had not seen the first April 9, 1999 note prior to her April 19, 1999 evaluation, that note was what had prompted the evaluation, and she testified that she had been informed of its contents. The April 9, 1999 note stated:

"***

"was no fluke it is a warning from God. I am to be given a new identity Dr. David Benjamin[,] Passport and all necessary Id[,] with a clean back round [sic] and honorary doctorates in the fields that I have contributed to[,] arts, medicine, Science etc[.] The State is to put between 20 and 30 mil dollars in an account opened for this Identity in the World Bank (INTL Bank for Recon + Redevelopment) with cards and Docs[,] Traveling clothes[,] luggage[,] anywhere (world) passes on TWA good for one year. And full pardon from the pending case."

Essentially, Dr. Burch's changed opinion turned on the second note, which neither she nor the court were [sic] aware of during the trial or mitigation hearing. The second note stated:

"God has instructed me to let you know the price is now 100 million and U.S. Diplomat is to be added to the credentials in addition to everything else."

We agree with the trial court that Dr. Burch's changed opinion was not credible in that it lacked reasonable foundation. Dr. Burch testified that the second note was more "florid" than appellant's previous communications, demonstrated increased delusional beliefs, and was demonstrative of one of the elements of competency, i.e., the ability of the accused to communicate with his or her counsel. However, we fail to see how the second note provided any new information to add to appellant's psychological profile, and it was not significantly relevant. Although Dr. Burch testified that the question of competency was close during the initial trial,

28

the second note's contents could not have swayed her opinion in light of her knowledge of the first note.  The second note was a continuation of the first note, reiterated the same views from the first note, and merely increased appellant's demands.  The overall insignificance of the second note is evidenced by the fact that trial counsel informed the court and Dr. Burch of the first note yet failed to inform the trial court or Dr. Burch of the second note.  We also note that, during her March 12 and April 19, 1999 evaluations of appellant, appellant told Dr. Burch essentially the same things contained in the first and second notes, thereby diminishing any significance of the second note.  As with the first and second notes, appellant told Dr. Burch that God was going to protect him from trial, give him a monetary settlement, and a chance to start a new life with a new name.  Thus, the second note contained no new information.

Further, although Dr. Burch testified the second note demonstrated one of the elements of incompetency to stand trial, i.e., that appellant cannot communicate rationally with counsel, we see no necessary correlation between the context of the second note and appellant's ability to communicate rationally with his attorneys during trial.  That appellant may have made bizarre demands in his second note does not support an automatic inference that appellant was also unable to communicate effectively with his attorneys.  There is no additional evidence to demonstrate that appellant could not communicate with his trial attorneys.  To the contrary, Beal testified that he communicated with appellant during trial, appellant never ignored any questions, never rambled in anger, and always responded appropriately.  Beal also testified that appellant made notes during trial.  Beal agreed that, although appellant claimed he did not remember what happened, this does not necessarily constitute refusing to discuss the case.  Beal further testified that appellant eventually gave him full details and a full accounting of his whereabouts at the time of the murder, although he claimed he was in bed sleeping at the time of the homicides and did not remember killing anybody.  Although Beal stated that appellant communicated less with him at trial than other clients had in the past, appellant could not have really helped him during trial because appellant claimed he was not at the scene and did not commit the murders.  Beal also testified that appellant effectively communicated with him about whether he knew any of the witnesses or whether they held a grudge against him.  In addition, after appellant told the trial judge that he did not know what a "PSI" was during the mitigation phase, Beal went off the record and explained to appellant that it was a pre-sentence investigation report.  When they went back on the record, appellant told the court that he now understood what it meant, thereby demonstrating his ability to understand his counsel's instruction.  The trial court noted several instances where appellant responded and acted appropriately during the hearings.  Dr. Burch also admitted during her post-conviction testimony that she did not attend the trial and does not know how effectively appellant communicated with his attorneys.  Therefore, Dr. Burch's conclusion that the second note demonstrated appellant could not communicate rationally with his counsel about the case is unpersuasive.

For these reasons, the second note could not form a reasonable basis for Dr. Burch to change her opinion of appellant's competency to stand trial. We find the trial court did not err in finding Dr. Burch's changed testimony not credible and lacking in any reasonable foundation.

With regard to Dr. Mossman's affidavit, at the hearing, the trial court refused to allow Dr. Mossman to testify, indicating that because his live testimony would be the same as his affidavit, it would consider Dr. Mossman's affidavit. However, in its decision, the trial court indicated that it would not consider Dr. Mossman's affidavit. Appellant argues the trial court's failure to consider Dr. Mossman's affidavit denied him due process.

We first point out that the trial court's refusal to take Dr. Mossman's affidavit into account was, in fact, partially based on what it perceived as a credibility issue. Although the trial court indicated that it would not "consider" the affidavit, it actually did consider Dr. Mossman's persuasiveness and credibility. The court pointed out that Dr. Mossman did not evaluate appellant prior to or during trial, and his evaluation did not occur until eight months after trial. Thus, the trial court was questioning the dubious reliability of Dr. Mossman's evaluation because of the remoteness of the exam. The trial court also pointed out that to accept Dr. Mossman's conclusion of incompetency would have directly contradicted Dr. Burch's competency opinion during that time. The trial court's comments also suggest that past experience with this particular expert raised some question of credibility. Therefore, the trial court did, in fact, give some rationale as to why it did not find Dr. Mossman's testimony persuasive on the issue of competency.

However, the trial court also rejected Dr. Mossman's affidavit outright on purely legal grounds, citing *State v. Steffen* (Aug. 7, 1991), Hamilton App. No. C-900596. In *Steffen*, the petitioner sought post-conviction relief, in part, on the basis of a psychologist's post-conviction critique of the court-appointed psychologists. The court found that challenging the competency of mental health experts with post-conviction experts does not invoke any constitutional issue and would turn such post-conviction proceedings into a never ending battle of experts. Although *Steffen* related to a challenge of an expert's trial and mitigation testimony, and the present case relates to a challenge of an expert's competency evaluations, we find its rationale applicable to and compelling in this case. In essence, Dr. Mossman was attempting to impeach the opinion of Dr. Burch. Although Dr. Burch since changed her opinion in this case, which we found above was unsupported by the evidence, to permit Dr. Mossman to challenge the prior competency determinations of Dr. Burch would prevent finality in any case involving psychological examinations, and encourage post-conviction expert shopping.

The First District Court of Appeals has followed the reasoning in *Steffen* numerous times and refused to accept the opinion of a "newly found" mental health

30

expert presented in a post-conviction petition in order to contradict the findings of the mental health expert used at trial.  See *State v. Clemons* (Aug. 30, 1999), Hamilton App. No. C-980456 (refusing the report of a newly found psychiatrist attached to a post-conviction petition to challenge the trial testimony of the court-appointed psychological expert to avoid a never ending battle of experts); *State v. Jamison* (Nov. 10, 1992), Hamilton App. No. C-910736 (refusing to consider the affidavit of a psychologist presented with a post-conviction petition to discredit the court-appointed psychologist used at trial); *State v. Holloway* (Jan. 29, 1992), Hamilton App. No. C-900805 (refusing to consider the post-conviction affidavits of three reviewing psychologists who discussed numerous alleged inadequacies in the evaluations performed by the defendant's court-appointed experts); *State v. Bedford* (Sept. 11, 1991), Hamilton App. No. C-900412 (same).  We find the reasoning in *Steffen* applies similarly to the present case to prevent Dr. Mossman from challenging the competency evaluations conducted prior to and during trial. Therefore, the trial court did not err in declining to consider Dr. Mossman's affidavit.

Appellant next argues the trial court erred in applying res judicata to the present case.  Under the doctrine of res judicata, a final judgment bars a convicted defendant from "raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment."  *State v. Perry* (1967), 10 Ohio St.2d 175, paragraph nine of the syllabus.  See, also, *State v. Szefcyk* (1996), 77 Ohio St.3d 93, 95 ("[*r*]*es judicata* is applicable in all postconviction relief proceedings").

A petitioner can overcome the res judicata bar to post-conviction relief only if the petitioner presents competent, relevant, and material evidence dehors, or outside, the record.  *State v. Lawson* (1995), 103 Ohio App.3d 307, 315.  However, the evidence relied upon must not be evidence that was in existence or available for the use at the time of trial and should have been submitted at trial if the petitioner wished to make use of it.  *State v. Lynch* (Dec. 21, 2001), Hamilton App. No. C-010209; *State v. Redd* (Aug. 31, 2001), Lucas App. No. L-00-1148; and *State v. Murphy* (Dec. 26, 2000), Franklin App. No. 00AP-233.

In the present case, the trial court found that appellant's competency could have been raised on direct appeal.  The trial court held that Dr. Burch testified at length during the mitigation phase regarding appellant's competency, and, thus, there was sufficient information in the record to challenge Dr. Burch's opinion. Further, the court stated that, because it concluded that Dr. Burch's opinion was not credible and it would not consider Dr. Mossman's affidavit, this evidence dehors the record failed to prevent the application of res judicata.  We agree with the trial court's rationale.

However, even if the trial court would have accepted both Drs. Burch and Mossman's opinions, we agree that res judicata could be applied under the present circumstances. A case with somewhat analogous facts to the present case is *State v. Bradley* (Dec. 2, 1996), Scioto App. No. 95CA2364. In *Bradley*, the trial court denied defendant's petition for post-conviction relief, which was based on the affidavits of two newly found psychologists and the defendant's two trial attorneys, who claimed the defendant had been unable to help them prepare the case. On appeal, the court of appeals affirmed. With regard to the affidavits from the trial attorneys, the court of appeals found that the information contained therein was available during trial and on appeal, and the doctrine of res judicata was applicable. With regard to the affidavits from the psychologists, the court noted that the psychologists examined the defendant for competency five years after the trial. The court also noted that the defendant was evaluated prior to and during trial by court-appointed examiners and examiners of the defendant's own choosing, all of whom found him competent. The court held that, although the information contained therein was outside the record, the application of res judicata was not precluded under such circumstances, citing *State v. Butler* (Mar. 19, 1992), Clark App. No. 2862, in which the court found that whether or not a defendant is competent to stand trial can be raised on direct appeal, and, thus, is subject to res judicata.

Likewise, in the present case, the testimony of appellant's trial counsel at the post-conviction hearing was res judicata because that information was available during trial and on direct appeal. Further, similar to *Bradley*, appellant was examined numerous times prior to and during trial by a psychologist of his own choosing and was found competent. Thus, following *Bradley*, the belated post-conviction competency evaluations by Drs. Burch and Mossman would not defeat the application of res judicata to the competency issue. Therefore, because the issue of appellant's competency could have been raised on direct appeal, we find res judicata was applicable to the present case. Appellant's first, second, and third assignments of error are overruled.

(App. Vol. VII, at 117-24).

**Standard of Review**

As noted earlier, under the AEDPA, a federal court shall not issue a writ of habeas corpus on a claim that the state courts *adjudicated on the merits* unless the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. §

2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).  The restrictive review set forth in 2254(d), by its very language, applies only to claims that the state courts adjudicated on the merits.  *Pinholster*, 563 U.S. at 181.

Here, there is ambiguity as to whether the state courts adjudicated Petitioner's first ground for relief on the merits in postconviction.  On one hand, the trial and appellate courts denied Petitioner's claim on the basis of res judicata, concluding that Petitioner could have raised his claim on direct appeal.  (App. Vol. V, at 206; App. Vol. VII, at 122-23).

On the other hand, both courts considered the nature and weight of the evidence that Petitioner offered in support of his claim that he was tried while incompetent.  The trial court dismissed Dr. Mossman's affidavit not just as legally barred, but on the basis of a credibility determination.  Similarly, the trial court discussed Dr. Burch's postconviction testimony at length en route to finding that her "changed opinion" was not credible.  (App. Vol. V., at 203-05).  The state appellate court, in affirming the trial court, also discussed the evidence in considerable detail. The state appellate court agreed, for instance, "that Dr. Burch's changed opinion was not credible in that it lacked reasonable foundation."  (App. Vol. VII, at 119).  The state appellate court also characterized the trial court's refusal to take Dr. Mossman's affidavit into account as "partially based on what [the trial court] perceived as a credibility issue[]" and further opined that "[a]lthough the trial court indicated that it would not 'consider' the affidavit, it actually did consider Dr. Mossman's persuasiveness and credibility."  (*Id*. at 121).  The state appellate court then proceeded to do the same.

The state courts' decisions can only be read as rejecting Petitioner's claim not because of a wholesale absence of evidentiary support, but because of a lack of sufficient, credible, persuasive evidentiary support. That is a ruling on the merits. *See Allen v. Mitchell*, 953 F.3d 858, 870-71 (6th Cir. 2020) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Rice v. Collins*, 546 U.S. 333, 341-42 (2006)) (noting that a state-court decision based on credibility determinations constitutes a decision on the merits for purposes of AEDPA).

When the Court determined in its earlier Opinion and Order addressing procedural default that Petitioner's first ground was not procedurally defaulted, the Court was careful to note:

> Essentially, this Court is only determining that petitioner's first ground for relief, alleging that he was tried while incompetent, is not procedurally defaulted. This finding simply permits the parties to subsequently address the merits of the claim, *but does not otherwise indicate that any other factual findings or legal conclusions of the state courts were in error.*

(ECF No. 31-1, at Page ID # 323-324 (emphasis added)). This is consistent with Supreme Court decisions that have in various contexts unfailingly emphasized the deference that federal habeas courts must pay to state-court decisions. *See, e.g.*, *Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA thus imposes a highly deferential standard for evaluating state-court rulings . . . and demands that state-court decisions be given the benefit of the doubt." (internal quotation marks and citations omitted)).

**Law Governing Competency Claims**

The Due Process Clause is violated when a mentally incompetent defendant is tried and convicted. *Drope,* 420 U.S. at 171; *see also Pate*, 383 U.S. at 378; *Dusky*, 362 U.S. at 402. "It has long been accepted," the Supreme Court observed in *Drope*, "that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings

against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope*, 420 U.S. at 171. The Supreme Court in *Drope* thus reiterated what it had first held in *Dusky*—namely that a defendant is competent to stand trial if he has sufficient present ability to consult with counsel with a reasonable degree of rational understanding, as well as a rational and factual understanding of the proceedings against him. *Drope*, 420 U.S. at 172; *Dusky*, 362 U.S. at 402; *see also Gall v. Parker*, 231 F.3d 265, 284 (6th Cir. 2000).

To prevail in habeas corpus on a substantive claim of incompetence to stand trial, a petitioner must present evidence that creates a "real, substantial, and legitimate doubt" as to his competency in the months leading up to and during his trial. *Walker v. Atty. Gen. for the State of Oklahoma*, 167 F.3d 1339, 1347 (10th Cir. 1999); *see also Thirkield v. Pitcher*, 199 F. Supp. 2d 637, 653 (E.D. Mich. 2002) ("To obtain relief on a substantive incompetence claim, petitioner must present evidence sufficient to positively, unequivocally, and clearly generate a real, substantial and legitimate doubt as to [his] mental capacity." (citation and internal quotation marks omitted)). The Court is mindful of a statement by the Sixth Circuit in *Woodley v. Bradshaw*, 451 F. App'x 529, 538 (6th Cir. 2011), "echo[ing] the Supreme Court's encouragement to err on the side of caution in matters of competency and not to be chary in ordering psychiatric evaluations." *Id.* at 538-39 (citing *Drope*, 420 U.S. at 178 n.13).

**Discussion**

As the Supreme Court observed in *Drope*,

> evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but . . . even one of these factors standing alone may, in some circumstances, be sufficient."

*Drope*, 420 U.S. 162, 180 (1975). This Court's determination that the state courts adjudicated Petitioner's claim on the merits informs the issue of what evidence the Court may consider in addressing Petitioner's claim.

In *Pinholster*, 563 U.S. at 180, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." To the extent that the central issue before the Court is review of a state-court competency determination, which is a factual finding and therefore governed by § 2254(d)(2), *Pinholster* is no less applicable. *See Sanders v. Curtin*, 529 F. App'x 506, 517 n.5 (6th Cir. 2013) ("Although *Pinholster* specifically addressed subsection (d)(1), subsection (d)(2), by its terms, also requires a federal court to limit its review to the record that was before the state court."); *see also Landers v. Warden, Atty. Gen. of Ala.*, 776 F.3d 1288, 1295 (11th Cir. 2015) (collecting cases). *Pinholster* unmistakably precludes this Court from considering the depositions of mitigation investigator Jim Crates and psychiatric expert Douglas Mossman that Petitioner added to the record in habeas corpus.

What remains available to consider is everything that the state courts had before them— namely, all of the evidence that was presented during trial and postconviction. That evidence consists of trial-phase and mitigation-phase testimony, specifically as it pertains to Petitioner's history of mental illness and resulting behavior; the postconviction petition and supporting exhibits; and the postconviction evidentiary hearing testimony and exhibits.

A state court's competency determination is a finding of fact to which federal habeas courts must defer. The Sixth Circuit stressed this principle in *Franklin v. Bradshaw*, 695 F.3d 439 (6th Cir. 2012), as follows:

> [A] state-court determination of competence is a factual finding to which deference must be paid. *Thompson v. Keohane*, 516 U.S. 99, 108-11, 116 S. Ct. 457, 133 L.Ed.2d 383 (1995). "[R]egardless of whether we would reach a different conclusion were we reviewing the case de novo, the findings of the state court must be upheld unless there is clear and convincing evidence to the contrary." *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001) (applying 28 U.S.C. § 2254(e)(1)); *see also Wood v. Allen*, 558 U.S. 290, 130 S. Ct. 841, 849, 175 L.Ed.2d 738 (2010) (stating that as for 28 U.S.C. 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance"). And that deference must be paid even to state-court factual findings made on appeal. *See Rushen v. Spain*, 464 U.S. 114, 120, 104 S. Ct. 453, 78 L.Ed.2d 267 (1983); *Sumner v. Mata*, 449 U.S. 539, 546-47, 101 S. Ct. 764, 66 L.Ed.2d 722 (1981). "Further, the Supreme Court has very recently made abundantly clear that the review granted by AEDPA is even more constricted than AEDPA's plain language already suggests." *Peak v. Webb*, 673 F.3d 465, 472 (6th Cir. 2012). "[S]o long as fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under AEDPA. *Harrington v. Richter*, 131 S. Ct. 770, 786, 178 L.Ed.2d 624 (2011) (internal quotation marks omitted).

*Franklin*, 695 F.3d at 447-48.

This Court has already determined that although the state courts in postconviction proceedings purported to deny Petitioner's claim on the basis of res judicata, the state courts in fact rejected Petitioner's claim on the merits by making credibility determinations. (*See supra* at 34). That is tantamount to a finding that Petitioner was competent, to which this Court must defer absent a showing that it was unreasonable in light of the evidence presented during the state-court proceeding.[5]

In short, this Court has before it a decision made by a state trial judge who was informed by defense counsel and the defense's psychological expert at the commencement of the trial that

---

[5] This Court is mindful of the cases that describe a state-court competency determination as a factual finding that is entitled to a presumption of correctness rebuttable only by clear and convincing evidence. *See, e.g., Mackey v. Dutton*, 217 F.3d 399, 412-14 (6th Cir. 2000). That is the standard codified in 28 U.S.C. § 2254(e)(1). The Supreme Court has not defined the relationship between § 2254(d)(2) and § 2254(e)(1). *Wood v. Allen*, 558 U.S. 290, 300-01 (2010).

Petitioner was competent. That state trial judge subsequently had the benefit of observing firsthand not only Petitioner but also the psychological expert and other testifying witnesses. After painstaking consideration and an obvious commitment to safeguarding Petitioner's rights (App. Vol. IV, at 215), that state trial judge rejected the assertion that Petitioner had been tried while incompetent. And the state appellate court affirmed that decision. (App. Vol. VII, at 117-24). This Court may not disturb that determination by substituting its own.

The issue before the Court is whether the state court's decision (rejecting Petitioner's claim that he was tried while incompetent) was based on an unreasonable determination of the facts (that Petitioner was competent) in light of the evidence presented in the state-court proceeding. *See Carter v. Bogan*, 900 F.3d 754, 771 (6th Cir. 2018). As the Court noted earlier, Petitioner argued in his postconviction action that he was tried while incompetent. He supported that claim with an affidavit by Dr. Mossman, who had evaluated Petitioner eight months after trial and concluded that Petitioner's mental illness substantially compromised his understanding of the proceedings and his ability to consult with defense counsel. (*See* App. Vol. IV, at 75-114). Petitioner also supported the claim with the two notes that he had passed to defense counsel, one during a pretrial hearing and the second during the trial itself. (*Id.* at 115-117). After reviewing the postconviction action and supporting exhibits, the trial court decided to hold an evidentiary hearing on the issue of Petitioner's mental state at the time of the trial, as well as the offense.

Tom Beal, Petitioner's trial counsel, testified first and essentially described the delusional statements Petitioner began making in January 1999 and continued to make throughout his trial, and the resulting difficulties Beal had trying to get Petitioner to discuss the case. The essence of Dr. Burch's 2003 postconviction testimony was that although she had testified during Petitioner's

1999 mitigation hearing that she had on several occasions prior to trial formed the opinion that Petitioner, although delusional, was competent, she was now of the view, based on additional information about Petitioner's inability or unwillingness to communicate effectively with his attorneys, that Petitioner had not been competent to stand trial. (Evid. Hrg. Tr., at 72-76).

The "evidence presented" consisted of the testimony and notes of a defense attorney who, at the outset of trial, made a point of stating on the record that he was not challenging Petitioner's competency, but who three years later was raising questions about Petitioner's competency, albeit without stating as much outright. The "evidence presented" was also the testimony and notes of an expert who expressly and repeatedly testified during Petitioner's 1999 mitigation hearing that Petitioner was competent, but who three years later changed her opinion—ostensibly on the basis of a single handwritten note. (Evid. Hrg. Tr., at 74-76; 87-88; 102-103; 105-106). Although Dr. Burch at times attempted to clarify that it was more than just the second (shorter) note Petitioner had passed to defense counsel during trial, which note she had not seen or been made aware of at the time of Petitioner's trial, Dr. Burch repeatedly returned to the second note as the reason she was now of the view that Petitioner had been incompetent when he was tried. (*See id.* at 76, 90-92, 103).

It seems highly improbable that Dr. Burch could have met with Petitioner three times before his trial and observed firsthand his delusional thinking, and yet not been aware of or at least suspected that he might not be working cooperatively with his defense counsel. In fact, Mr. Beal's testimony that defense counsel, Dr. Burch, and Mr. Crates met on several occasions and discussed how to get Petitioner to discuss his case undercuts Dr. Burch's alleged reasoning. (Evid. Hrg., Tr., at 17-18, 21, 59, 72; Evid. Hrg. Tr. Ex. 1, Beal's notes dated 2/4/99; Evid. Hrg. Tr. Ex. 1, Beal's

notes dated 2/12/99). Nor was it unreasonable for the trial court to view with skepticism Dr. Burch's postconviction testimony that she would have reached a different opinion at trial had she been alerted by defense counsel that Petitioner had not been cooperating with them and/or seen the two notes that Petitioner had passed to his defense counsel, the first during a pretrial hearing and the second during the trial itself, wherein Petitioner warned of dire consequences and explained that he was to receive a new identity, travel documents, and millions of dollars in restitution. (Evid. Hrg. Tr., at 76, 87-90, 102-03).

In making this determination, the Court notes that the postconviction record contains varying sources of documentation of Petitioner's apparent mental decline, beginning around January 1999 and continuing if not intensifying through April 1999. Petitioner repeatedly stated that he was a prophet of God; that God was going to deliver him from his trial and consume his enemies; that certain weather occurrences and other current events were related to his trial; that he would be provided with restitution and a new identity; and that he was a director and an inventor, had created certain cures that had been stolen from him, and had had other ideas stolen from him and used by television personalities and other entertainers. (Tr. Vol. IX, at 164-65, 165-66, 176, 177-78, 180; Evid. Hrg., Exh. 4C, Burch's Notes Dated 2/12/99, at 7; Evid. Hrg., Tr., Exh. 1, Beal's Notes; Evid. Hrg. Tr., Exhs. 4C, 4D, 4E, Burch's Notes Dated 2/12/99, 3/12/99, 4/19/99). Evidence that a "break" in Petitioner's pattern of thinking became noticeable in January 1999 and that his mental deterioration continued and increased in intensity through April 1999 is prevalent throughout Mr. Beal's 1999 notes, Dr. Burch's 1999 notes, the two notes that Petitioner passed to his defense counsel in April and May 1999, Dr. Burch's 1999 mitigation testimony, and Dr. Mossman's 2000 affidavit. Certain jail records introduced during postconviction proceedings—

40

one, a Sheriff's correspondence documenting Petitioner's claim to Deputy Edgington that he (Petitioner) was clairvoyant and capable of "astral travel" where his spirit leaves his body, and the other, a Sheriff's Office witness statement documenting inmate Joseph Bain's reporting of and complaints about Petitioner's recent and increasingly bizarre behavior—provide additional, contemporaneous evidence by disinterested witnesses of Petitioner's delusional pattern of thinking in the several months leading up to his April/May 1999 trial. And it is clear from Mr. Beal's notes that beginning in January 1999 Mr. Beal could not get Petitioner to discuss his case.

The issue is whether the state courts' competency determination was unreasonable in light of this evidence. In *Mackey v. Dutton*, 217 F.3d at 399, the Sixth Circuit rejected the petitioner's procedural competency claim that the trial court had erred in failing to conduct a competency hearing. In so holding, the Sixth Circuit reiterated that reviewing courts must not substitute their judgment for that of a sitting trial court when it comes to credibility determinations and that a state court's factual findings must be honored if they are fairly supported by the record. *Id*. at 412-13.

Having considered against the backdrop of controlling law the state courts' rejection of Petitioner's claim that he was tried while incompetent and resulting finding that Petitioner was competent when tried, this Court cannot find that the state courts' determinations were unreasonable in light of the evidence presented in the state-court proceeding. Prior to trial, the state court made sure that Petitioner had access to an expert of his own choosing. Petitioner's expert and attorney told the trial court on multiple occasions before and during the trial that Petitioner was competent. The trial court personally observed and interacted with Petitioner during trial. The state trial court made factual findings and credibility determinations that are entitled to a considerable level of deference. The state trial court said that it had "struggled mightily" with

its decision and "would be unable to, in good conscience, allow a death sentence to stand if it believed Defendant was incompetent at the time of trial." (App. Vol. V, at 215). Nothing in the record gives this Court reason to question the trial court's sincerity or endeavor.

For the foregoing reasons, the Court **DENIES as without merit** Petitioner's first ground for relief.

**Ground Two:** **Denial of Opportunity to Develop Competency Claim in Postconviction.**

Petitioner argues in his second ground for relief that the state trial court erred by not considering Dr. Mossman's affidavit and not allowing him to testify. (ECF No. 107, at Page ID # 5397-5399; ECF No. 59, at Page ID # 835-39). As the Court indicated earlier in this decision, however, Petitioner's claim does not appear to be properly before the Court for consideration. This Court noted in its March 30, 2007 Opinion and Order addressing discovery that this claim did not appear to be cognizable in habeas corpus. (ECF No. 37, at Page ID # 405-407). The Supreme Court has since ruled that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez v. Ryan*, 566 U.S. 1, 17 (2012). The Court is not persuaded, however, that *Martinez*'s implicit recognition of the importance of state collateral review goes so far as to elevate to a constitutional dimension every claim alleging a denial of due process in postconviction. That would eviscerate the long-standing principle in the Sixth Circuit, stemming from *Pennsylvania v. Finley*, 481 U.S. 551 (1987), that "errors in post-conviction proceedings are outside the scope of federal habeas corpus review." *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007); *see also Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) (citing *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir. 1986)). This Court declines to

extend *Martinez* in such a broad manner.[6]  Petitioner's second ground for relief is therefore **DENIED** as not cognizable in habeas corpus.

**Ground Three: Failure of Trial Court to Conduct a Competency Hearing Sua Sponte.**

Petitioner argues in his third ground for relief that the trial court erred in not sua sponte conducting a competency hearing prior to trial.  (ECF No. 107, at Page ID # 5399-5401).  As with Petitioner's second ground for relief, the Court has already noted that Petitioner's third ground for relief does not appear to be properly before this Court for review on the merits.  This Court held in its March 30, 2006 Opinion and Order that this claim appeared to be barred by procedural default unless Petitioner could subsequently demonstrate cause and prejudice to excuse the default.  (ECF No. 31-1, at Page ID # 324-328).  Petitioner asserts first that he could not have raised this ground until the facts were fully supported in postconviction and, alternatively, that ineffective assistance of appellate counsel constitutes cause and prejudice sufficient to excuse Petitioner's failure to raise the claim on direct appeal.

---

[6] The Sixth Circuit has declined to revisit its decisions in *Greer, Kirby,* and *Cress* where a defendant argued for reconsideration in light of *Martinez* because "a published prior panel decision 'remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or the Sixth Circuit sitting *en banc* overrules the prior decision.'"  *Leonard v. Warden*, 846 F.3d 832, 855 (6th Cir. 2017) (quoting *Stein v. Regions Morgan Keegan Select High Income Fund, Inc.,* 821 F.3d 780, 789 (6th Cir. 2016) (quoting *United States v. Elbe*, 774 F.3d 885, 891 (6th Cir. 2014))). Petitioner has not cited any *en banc* decision or any Supreme Court opinion that undermines the logic of *Greer*, *Kirby,* and *Cress.* Additionally, without Supreme Court precedent evaluating the constitutional adequacy of state post-conviction review proceedings, Petitioner cannot establish the necessary precondition for issuing a writ of habeas corpus, namely that the state court's postconviction decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." *Leonard*, 846 F.3d at 855 (quoting 28 U.S.C. § 2254(d)(1)).

The Court finds neither argument persuasive and reiterates its conclusion that Petitioner's claim is barred by procedural default. (*See supra* at 12). In any event, the Court concludes that Petitioner's claim is meritless. Petitioner's trial counsel expressly represented on the record that Petitioner's competency was not an issue and that the defense psychologist was of the view that Petitioner was competent. (Tr. Vol. I, at 40-41). The trial court was entirely within its rights to rely on counsel's representations, especially in light of the fact that Petitioner apparently did not display any outward signs of his delusional thinking during his trial. (*See* App. Vol. 5, at 194-195; Tr. Vol. 9, at 11-14).

The Court **DENIES** as procedurally defaulted and without merit Petitioner's third ground for relief.

**<u>Ground Four</u>: Ineffective Assistance for the Failure to Protect Competency Rights.**

Petitioner argues in his fourth ground for relief that his attorneys were ineffective for failing to request a competency hearing. (ECF No. 107, at Page ID # 5401-5404; ECF No. 59, at Page ID # 848-859). The facts informing this claim are sufficiently set forth in this Court's discussion of Petitioner's first ground for relief. The essence of Petitioner's argument here is that his defense attorneys were ineffective for failing to discuss specifics about Dr. Burch's visits with Petitioner and for failing to share specifics about their meetings with Petitioner. Had counsel done so, Petitioner argues, counsel "would have amassed even more indications that Braden was not competent." (ECF No. 59, at Page ID # 852).

Respondent reiterates the procedural-default arguments that this Court rejected in its March 30, 2006 Opinion and Order (ECF No. 31-1, at Page ID # 330-333) and additionally argues that Petitioner's claim is without merit. (ECF No. 65, at Page ID # 957-969).

44

The state courts rejected part of Petitioner's claim on direct appeal and other parts of Petitioner's claim in postconviction. On direct appeal, the Ohio Supreme Court rejected Petitioner's claim challenging his trial counsel's failure to raise the issue of competency as follows:

*Failure to raise competency*. Braden argues that his counsel were deficient by failing to raise his competency to stand trial as an issue after the trial had begun. According to Braden, his counsel should have requested a competency hearing because Dr. Burch testified that Braden believed that he would not be tried because God would deliver him and noted that he was becoming more distrustful and dismissive of his lawyers.

A defendant is legally incompetent if "incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense." R.C. 2945.37(G). Due process principles forbid subjecting a legally incompetent criminal defendant to trial. *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 1995 Ohio 310, 650 N.E.2d 433.

Braden's defense counsel were alert to the possibility of Braden's incompetence. At the beginning of the trial, Braden's counsel notified the trial court that "we felt there might be some mental deterioration * * * [and] requested Dr. Kate Burch, our psychologist * * * to inquire" into his competency. Consequently, Dr. Burch examined Braden on three different occasions (February 12, March 12, and April 19, 1999) to ensure his competence and concluded after conducting each evaluation that Braden was competent.

Dr. Burch diagnosed Braden as suffering from paranoid schizophrenia, but this diagnosis is not synonymous with incompetence to stand trial. A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel." *State v. Bock* (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 502 N.E.2d 1016.

Moreover, the record reflects no behavior by Braden during trial that would suggest the lack of legal competency. During trial, Braden answered the trial court's questions about visits from Dr. Burch, expressed satisfaction with his counsel, told the judge he understood his appellate rights, said he did not want a presentence investigation and informed the court that he did not wish to make a statement prior to sentencing. See *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 164, 2001 Ohio 132, 749 N.E.2d 226 (counsel's failure to raise competency is not evidence of deficient performance when neither psychologist nor psychiatrist found that the defendant lacked competence, and nothing in the defendant's behavior at trial suggested the lack of competence). Thus, we find that the defense counsel were not deficient by failing to request a competency hearing after the trial had begun.

*Braden*, 98 Ohio St. 3d at 374-75; App. Vol. III, at 250-51.

In postconviction proceedings, Petitioner raised claims of ineffective assistance for counsel's failure to provide the trial court with all the information it needed to order a competency hearing (ground two) and failure to request a competency determination (ground five). (App. Vol. 4, at 40-42, 48-50). The state trial court rejected those claims on the merits as follows:

> *Second Ground for Relief: Ineffectiveness of Counsel Deprived Trial Court of Information Necessary to Hold Competency Hearing*
>
> Upon consideration, the Court finds no merit in Defendant's arguments.
>
> Counsel's alleged failure to apprise the Court of the Second Note did not constitute ineffective assistance of counsel.
>
> As stated previously, the Second Note, from a layman's perspective, did not signify a marked departure from Defendant's previous behavior, which Dr. Burch had evaluated and concluded, nonetheless, the Defendant was competent.
>
> Accordingly, with respect to the Second Ground for Relief, Defendant has failed to satisfy the *Strickland* standard as counsel's representation did not fall below an objective standard of reasonableness.
>
> Thus, the Second Ground for Relief is hereby DENIED.
>
> ***
>
> *Fifth Ground for Relief: Ineffectiveness of Counsel in Not Moving for a Competency Determination*
>
> Dr. Burch repeatedly opined to defense counsel that Defendant was competent. As such, if defense counsel had moved for a competency determination, they did not have an expert to substantiate their request.
>
> Moreover, while Defendant repeatedly argues defense counsel allegedly failed to inform Dr. Burch of Defendant's inability to communicate with them, the evidence does not support this position.
>
> Defendant responded to questions posed by counsel and appeared to pay attention during trial.

If there was specific information regarding the interaction between Defendant and counsel which Dr. Burch was seeking to obtain for her evaluation regarding competency, as the mental health expert, she should have questioned counsel directly instead of relying upon counsel to inform her.

Therefore, the Court holds defense counsel's representation of Defendant did not fall below an objective standard of reasonableness.

Accordingly, the Fifth Ground for Relief is hereby DENIED.

(App. Vol. 5, at 210, 212).

The state appellate court rejected on the merits Petitioner's claim that his attorneys were ineffective for failing to alert the trial court about the second note that Petitioner passed to his defense counsel during trial and rejected his claim that his attorneys were ineffective in failing to request a competency hearing based on res judicata. Specifically, the state appellate court held:

Appellant argues in his fifth assignment of error the trial court erred in finding his trial counsel did not provide ineffective assistance. Appellant contends that his trial counsel was ineffective for failing to alert the trial court to the second note and for failing to request a competency hearing. In order to prevail on the basis of ineffective assistance of counsel, appellant must demonstrate his counsel's performance fell below an objective standard of reasonableness, and the deficient performance prejudiced him to the extent of rendering his conviction unreliable. See *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052. With regard to the second note, as explained above, the second note added nothing new to appellant's psychological profile and was not significantly relevant. We do not see how the second note's contents could have swayed Dr. Burch or the trial court's opinion of appellant's competency in light of their knowledge of the first note. The second note reiterated the same views from the first note, and merely changed appellant's demands. Further, as indicated above, we see no necessary correlation between the content of the second note and appellant's ability to communicate rationally with his counsel during the trial.

With regard to trial counsel's failure to request a competency hearing, this issue is barred by res judicata. Appellant raised this issue on direct appeal in *Braden*. The Ohio Supreme Court held that appellant's trial counsel was not deficient by failing to request a competency hearing. *Braden*, at ¶117. Appellant's counsel made reasonable efforts to ascertain the competency of appellant to stand trial. Appellant's counsel scheduled four examinations of appellant by a

47

psychologist of his own choosing. The specific results of Dr. Burch's examinations made clear that there was no evidence to compel a competency hearing. Therefore, appellant's fifth assignment of error is overruled.

(App. Vol. VII, at 125).

The issue for this Court to resolve is whether the state-court decisions rejecting Petitioner's claim unreasonably applied or contravened clearly established federal law.[7] To prevail on a claim of ineffective assistance of counsel, Petitioner must demonstrate (1) that counsel's performance was deficient, i.e., objectively unreasonable under prevailing professional norms; and (2) that this deficient performance prejudiced Petitioner. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Prejudice exists when there is a reasonable probability that the result of the proceedings would have been different but for counsel's professional errors. *Id.* at 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.* Reviewing courts are not required to conduct an analysis under both prongs of *Strickland*; an insufficient showing of either prong ends the inquiry. *Id.* at 697. Nor are courts required to approach the *Strickland* analysis in a certain order. *Id.*

Counsel's failure to request a competency hearing "might render counsel's performance objectively unreasonable, 'provided there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency.'" *United States v. Dubrule*, 822 F.3d 866, 881 (6th Cir. 2016) (quoting *Jermyn v. Horn*, 266 F.3d 257, 283 (3d Cir. 2001)). To prove prejudice under this theory, a petitioner must demonstrate a reasonable probability that but

---

[7] The Court here focuses not on the record-based claim of ineffective assistance that was considered and rejected by the Ohio Supreme Court on direct appeal, but on the more comprehensive ineffective-assistance claims that were considered and rejected in postconviction proceedings.

for counsel's failure to request a competency evaluation prior to or during trial, the result of his trial would have been different. *Id.*

First, while Mr. Beal's notes from his pretrial meetings with Petitioner raise questions as to Petitioner's ability to meaningfully participate in his case, the Court is not convinced that counsel performed below an objectively reasonable level by not requesting a fourth competency hearing once trial began. Mr. Beal obviously had concerns following his visits with Petitioner because he persuaded the trial court to expand Dr. Burch's role from a mitigation expert to additionally monitoring Petitioner's competency. (Tr. Vol. I at 40-41; Evid. Hrg. Tr. at 15-16). Dr. Burch evaluated Petitioner three times in the three months leading up to Petitioner's trial and opined each time that Petitioner was competent. By all accounts, Petitioner exhibited no outward signs of incompetency during his trial. (*See* App. Vol. 5, at 194-195; Tr. Vo. 9, at 11-14). He appeared to participate appropriately when required and to communicate effectively with counsel. Even considering the two handwritten notes from Petitioner expressing delusional thinking, defense counsel could not have reasonably believed that Dr. Burch would suddenly change her opinion as to Petitioner's competency if produced for a fourth examination. Nor does the Court find that defense counsel could have reasonably believed that another psychological expert would have reached a conclusion different from Dr. Burch's three opinions of competency shortly before his trial based on the record evidence.

The record further casts doubt on Petitioner's contention that his counsel were ineffective for failing to discuss with Dr. Burch the specifics of her visits with Petitioner and the specifics of their visits with Petitioner. Mr. Beal's notes and testimony from the evidentiary hearing reveal that Dr. Burch was aware to some degree of Petitioner's lacking involvement in his case since

defense counsel strategized with Dr. Burch and Mr. Crates on several occasions about how to get Petitioner to discuss his case. (Evid. Hrg. Tr. at 17-18, 21, 59, 72; Evid. Hrg. Tr. Ex. 1, Beal's notes dated 2/4/99; Evid. Hrg. Tr. Ex. 1, Beal's notes dated 2/12/99). While Dr. Burch allegedly based her competency determination in part on a lack of knowledge that Petitioner wasn't cooperating with his defense counsel, this is simply not reflected in the record. The fact that Dr. Burch and Mr. Crates strategized about this issue with defense counsel undermines any allegation of deficient performance by counsel. And as discussed above, this evidence not only weakens the credibility of Dr. Burch's testimony, it also demonstrates that defense counsel were actively pursuing the issue of Petitioner's competency, which does not support Petitioner's allegations of counsel's deficient performance.

Notwithstanding any questions that may exist as to defense counsel's decision not to challenge Petitioner's competency once trial began, additional inquiry into counsel's performance is unnecessary because Petitioner cannot meet the prejudice prong of *Strickland*. After exhaustively reviewing the facts arising out of Mr. Beal's representation of Petitioner, this Court found that the state court's competency determination was not unreasonable and that the trial court did not err in failing to order a competency hearing sua sponte. (*See supra* at 42, 44-45). Because Petitioner's claim that he was tried while incompetent is meritless, there can likewise be no merit to his related claim that his counsel were constitutionally ineffective for failing to request a competency hearing. *See Carter v. Bogan*, 900 F.3d 754, 775 (6th Cir. 2018) (citing *Franklin v. Bradshaw*, 695 F.3d 439, 451 (6th Cir. 2012)).[8] No prejudice results from a failure to raise an

---

[8] Other circuits have followed this same line of reasoning. *See Grant v. Brown*, 312 F. App'x 71, 73 (9th Cir. 2009) (finding it unnecessary to address counsel's performance where the court concluded that petitioner was competent at trial and thus was not prejudiced by his attorney's

argument that would have been lost anyway. *Franklin*, 695 F.3d at 452; *see also Cowans v. Bagley*, 639 F.3d 241, 250 (6th Cir. 2011) (finding that prejudice could not be established in view of the state court's presumptively correct conclusion that petitioner was competent because result of the trial would not have changed had counsel requested a competency hearing). Petitioner thus cannot demonstrate a reasonable probability that the result of his trial would have been different had defense counsel requested another competency examination once his trial began. *See Grant v. Brown*, 312 F. App'x at 73 (citing *Strickland*, 466 U.S. at 694) (other citation omitted). Since Petitioner has failed to establish deficient performance and resulting prejudice under *Strickland*, this Court **DENIES** as meritless his fourth ground for relief.

**Ground Five:** **Mitigation-Phase Ineffective Assistance of Counsel—Failure to Investigate.**

Petitioner argues in his fifth ground for relief that his trial attorneys performed deficiently and to his prejudice in connection with the mitigation phase of his trial when they failed to interview and call to testify friends and Petitioner's former sister-in-law. Petitioner asserts that these witnesses were available and willing to provide relevant testimony that would have benefited Petitioner's mitigation case. (ECF No. 107, at Page ID # 5405-5407; Brief of Petitioner, ECF No. 59, at Page ID #860-863). Petitioner notes that two of those friends, Jim Gantt and Karl Jeney,

---

alleged errors); *Davis v. Woodford*, 384 F.3d 628, 647 (9th Cir. 2004) ("In light of our evaluation of the substantive competence claim, Davis's claim that his trial attorneys rendered ineffective assistance of counsel by failing to move for a competency hearing in the trial court also fails."); *McCoy v. Lynaugh*, 874 F.2d 954, 964 (5th Cir. 1989) ("There can be no deficiency in failing to request a competency hearing where there is no evidence of incompetency."); *see also Tiller v. Esposito*, 911 F.2d 575, 576 n.2 (11th Cir. 1990) (applying same analysis in guilty-plea context).

visited Petitioner in jail on multiple occasions prior to Petitioner's trial and that their names and addresses appeared on the jail visitation logs and were readily available to defense counsel.

Petitioner contends that calling friends Gantt, Jeney, and Tom Callahan to testify could have humanized Petitioner to the jury and demonstrated that Petitioner was capable of forming and maintaining long-lasting friendships. (ECF No. 107, at Page ID # 5405). According to Petitioner, he and his friends were part of a group that routinely visited Department of Youth Services facilities to help the youths there. (*Id.*). He asserts that the friends also could have testified to his work ethic and kind and generous nature in caring for his parents at different times during his life. (*Id.*). Their testimony, Petitioner argues, could have shown the jury that Petitioner had a good side, was not manipulative, and took great strides to care for his ailing mother. (*Id.*). All three also could have allegedly provided testimony concerning their awareness of changes in Petitioner's mental state—specifically his increasing paranoia. (*Id.*).

Petitioner also faults defense counsel for failing to call his former sister-in-law, Susan Tinnerello. (*Id.* at Page ID # 5406). Mrs. Tinnerello, according to Petitioner, knew Petitioner's family well and was the only person to whom Petitioner's mother confided an incident that occurred between Petitioner's father, brother, and Petitioner so horrible that it prompted Petitioner's mother to file for divorce. (*Id.*). Mrs. Tinnerello also could have corroborated accounts of Petitioner's increasing paranoia in the years leading up to his trial. (*Id.*). Petitioner explains that although defense counsel wanted Mrs. Tinnerello to testify at Petitioner's mitigation hearing, when they learned that she would be out of town at the time of the hearing they took no steps to secure her testimony, such as taking her deposition or subpoenaing her. (*Id.*). Dr. Burch

spoke to Mrs. Tinnerello and did testify at the mitigation hearing as to some of the information set forth in Mrs. Tinnerello's affidavit.  (Tr. Vol. 11, at 34).

Petitioner argues that a question submitted by the jury during penalty-phase deliberations demonstrates that he was prejudiced by counsel's performance.  (ECF No. 59, at Page ID # 862). Petitioner notes that during its sentencing deliberations, the jury sent the trial court the following written question: "If a juror believes that aggravating circumstances outweigh mitigating factors, are they permitted to accept less than the death penalty?"  (*Id.* at Page ID # 861-862 (quoting Tr. Vol. X, at 85)).  Positing that at least one juror obviously did not want to sentence him to death, Petitioner argues that the omitted witnesses described above would have provided that juror or jurors sufficient additional evidence to find that the aggravating circumstances did not outweigh the mitigating factors beyond a reasonable doubt.  (*Id.* at Page ID # 862).  Petitioner thus asserts, consistent with *Strickland*'s prejudice component, that but for counsel's deficient performance, there is a reasonable probability that the outcome of Petitioner's mitigation hearing would have been different.  (*Id.*).

Finally, Petitioner asserts that because the state appellate court during the postconviction appeal rejected his claim on the basis of Ohio's procedural res judicata rule, § 2254(d)'s deference does not apply to this Court's review of the claim.  (ECF No. 59, at Page ID # 862).

Respondent concedes that this claim is preserved for review but asserts that it is devoid of merit.  (ECF No. 65, at Page ID # 969-980).  Noting that Petitioner never deposed the witnesses described above, Respondent asserts that affidavits that have never been subject to cross-examination are insufficient in this case to overcome the strong presumption that defense counsel's actions were a matter of trial strategy.  (*Id.* at Page ID # 970).  Respondent further asserts that

satisfying the prejudice component of the *Strickland* test requires more than an assertion that counsel's alleged deficiency had some conceivable effect on the result of the accused's trial. (*Id.* at Page ID # 972).

Recounting everything that defense counsel did in connection with the mitigation phase of Petitioner's trial, Respondent insists that defense counsel conducted a thorough investigation sufficient to insulate from scrutiny counsel's strategic decisions. (*Id.* at Page ID # 972-973). Respondent proceeds to describe the mitigation evidence that defense counsel presented through Petitioner's brother John Pancake, sister-in-law Kim Pancake, case workers Judy English and Karen Bader, and defense psychologist Dr. Kathleen Burch. (*Id.* at Page ID # 973-976). Comparing that testimony to the witness affidavits Petitioner now offers, submitted during state postconviction proceedings, Respondent argues that Petitioner has demonstrated neither deficient performance nor prejudice from the alleged deficiency. (*Id.* at Page ID # 978-980).

Respondent reiterates that the focus of this Court's determination must be on the nature and extent of investigation supporting defense counsel's decision of what evidence to introduce during mitigation. (*Id.* at Page ID # 994). To that point, Respondent asserts that "[t]here is no dispute that trial counsel, or its defense team, conducted a thorough investigation and spoke with people who knew Braden best." (*Id.* at Page ID # 978). Respondent concludes that postconviction affidavits that provide information largely cumulative to that which was presented at mitigation do not establish a Sixth Amendment violation. (*Id.* at Page ID # 978-979 (citing *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006) (other citations omitted)). Respondent further posits that *Strickland*'s prejudice component is not satisfied where the reviewing court is left with only speculation as to whether the outcome of the mitigation proceeding could have been otherwise,

54

but for counsel's alleged ineffectiveness. (*Id*. at Page ID # 979 (citing *Baze v. Parker*, 371 F.3d 310, 322 (6th Cir. 2004))). According to Respondent, defense counsel sought sympathy from the jury by highlighting through Dr. Burch's extensive testimony Petitioner's mental problems and setting forth through other witnesses all that Petitioner did to care for his ailing mother. (*Id*.). Respondent concludes that the postconviction affidavits Petitioner now offers constitute weaker mitigation evidence and are largely cumulative to the mitigation evidence that defense counsel did present. (*Id*. at Page ID # 980).

The constrictive standard of review set forth in 28 U.S.C. § 2254(d) does not apply to this Court's review of Petitioner's claim. That section applies only to claims that the state courts adjudicated *on the merits*. *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004). Thus, when a state court does not consider the merits of a claim and that claim is nonetheless properly before the federal courts in habeas corpus, the federal courts review that claim *de novo* "rather than through the deferential lens of AEDPA." *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005) (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)); *see also Clinkscale*, 375 F.3d at 436; *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003). The appellate court on postconviction review expressly and solely rejected Petitioner's claim on procedural grounds, not on the merits. (App. Vol. 7, at 126). As no procedural default was lodged or found against Petitioner's claim, it is properly before the Court for review on the merits. That being so, this Court reviews Petitioner's claim *de novo*. *See Hill*, 400 F.3d at 313 (citing *Maples*, 340 F.3d at 436).

It is well settled that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also Carter v. Bell*, 218 F.3d 581, 600 (6th Cir. 2000). The importance of competent

55

representation during the penalty phase of a capital trial cannot be understated, especially with respect to the duty to investigate. As a practical matter, all that stands between a defendant who has been convicted of capital murder and a death sentence is whatever mitigation evidence he can muster. *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999).

> Under the Ohio statute, a capital defendant found guilty of a death specification has to present some mitigating evidence in order to avoid the death penalty. If a jury has nothing to weigh against the aggravating circumstance, it almost certainly must find that the aggravating circumstance outweighs the (nonexistent) mitigating circumstances, and recommend death.

*Id.*; *see also Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005) (incorporating the 2003 American Bar Association (ABA) Guidelines regarding competent representation in capital cases); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (discussing the duty to investigate mitigating evidence and incorporating the 1989 ABA Guidelines regarding competent representation in capital cases). Thus, the Sixth Circuit has not hesitated to hold that "failure to investigate possible mitigating factors and failure to present mitigating evidence at sentencing **can** constitute ineffective assistance of counsel under the Sixth Amendment." *Martin v. Mitchell*, 280 F.3d 594, 612 (6th Cir. 2002) (citing *Carter v. Bell*, 218 F.3d at 600; *Skaggs v. Parker*, 235 F.3d 261, 271 (6th Cir. 2000)).

In the Sixth Circuit, the scope for reviewing ineffective-assistance claims during mitigation is shaped by the degree of counsel's alleged inadequacies. *See, e.g.*, *Cornwell v. Bradshaw*, 559 F.3d 398, 407 (6th Cir. 2009) ("In most cases where the Supreme Court has found capital defense counsel to be insufficient, defense counsel almost entirely failed to investigate the defendant's background or defense counsel stopped investigating even though it had no legitimate defense upon which to rely."). As the Sixth Circuit has explained, "[o]ur circuit's precedent has

56

distinguished between counsel's *complete* failure to conduct a mitigation investigation, where [the court is] likely to find deficient performance, and counsel's failure to conduct an *adequate* investigation, where the presumption of reasonable performance is more difficult to overcome." *Beuke v. Houk*, 537 F.3d 618, 643 (6th Cir. 2008) (citing *Campbell v. Coyle*, 260 F.3d 531, 552 (6th Cir. 2001); *Moore v. Parker*, 425 F.3d 250, 255 (6th Cir. 2005)). In *Beuke*, the Sixth Circuit explained:

> In the present case, defense counsel did not *completely fail* to conduct an investigation for mitigating evidence. Counsel spoke with Beuke's parents prior to [the] penalty phase of trial (although there is some question as to how much time counsel spent preparing Beuke's parents to testify), and presented his parents' testimony at the sentencing hearing. Defense counsel also asked the probation department to conduct a presentence investigation and a psychiatric evaluation. While these investigative efforts fall far short of an exhaustive search, they do not qualify as a complete failure to investigate. *See Martin v. Mitchell*, 280 F.3d 594, 613 (6th Cir. 2002) (finding that defense counsel did not completely fail to investigate where there was "limited contact between defense counsel and family members," "counsel requested a presentence report," and counsel "elicited the testimony of [petitioner's] mother and grandmother"). Because Beuke's attorneys did not entirely abdicate their duty to investigate for mitigating evidence, we must closely evaluate whether they exhibited specific deficiencies that were unreasonable under prevailing professional standards. *See Dickerson v. Bagley*, 453 F.3d 690, 701 (6th Cir. 2006).

*Beuke*, 537 F.3d at 643.

Against this backdrop, the Court cannot find that defense counsel were ineffective in connection with the mitigation phase as alleged by Petitioner. Defense counsel decided upon a cohesive strategy of establishing that Petitioner suffered from a significant mental illness that affected every aspect of his life, particularly his relationships, and resulted in an inability to hold a job, and ultimately led to his commission of the crimes. (Tr. Vol. IX, at 19-21). And the record demonstrates that defense counsel engaged in sufficient investigation to support that strategy.

(*See, e.g.*, Tr. Vol. IX, at 180; App. Vol. II, at 29-32, 127-28, 162, 163, 215-17, 218-19, 227-28, 229-30).

Following their appointment to represent Petitioner in August 1998 (App. Vol. I, at 36), defense attorneys Tom Beal and Lon Allen took near-immediate steps to initiate their mitigation investigation. Within weeks, defense counsel had sought and received approval for funds to employ mitigation specialist James Crates and investigator John Wright. (*Id.* at 50-53). On October 28, 1998, defense counsel obtained approval for funds to employ defense psychologist Dr. Kathleen Burch. (*Id.* at 86). Dr. Burch proceeded to meet with Petitioner on four occasions; conducted substantial interviews and assessments (Tr. Vol. IX, at 180); had frequent consultations with defense counsel and/or James Crates (*Id.* at 163); and reviewed a wealth of records from Petitioner's background (*Id.* at 170-71, 183). Four entries dated February 3, 1999, directed a comprehensive release of documents and records for the mitigation preparation. (App. Vol. II, at 29-32). The itemized bills of Crates, Wright, and attorneys Beal and Allen and entries approving funds for Dr. Burch are further evidence of defense counsel's thorough and continuing investigation in support of their mitigation case. (*Id.* at 127-28, 162, 163, 215-17, 218-19, 227-28, 229-30).

At the mitigation hearing, defense counsel called Petitioner's brother John Pancake, sister-in-law Kim Pancake, social workers Judy English and Karen Bader, and defense psychologist Dr. Kathleen Burch. Through John and Kim Pancake's testimony, defense counsel presented evidence of Petitioner's difficult childhood, Petitioner's ailing mother and the toll caring for her took on Petitioner, and the noticeable change in mental stability and demeanor that Petitioner exhibited upon his discharge from the Navy. (Tr. Vol. IX, at 23-67). The jury learned that after a sister

(whom Petitioner never knew) was killed, Petitioner's father began drinking heavily and ultimately abandoned the family. (*Id.* at 24-25). Petitioner's mother was forced to work several jobs, and her absence led to an unstable home life for Petitioner and his brother growing up. (*Id.*).

The jury also learned that for several years up until his arrest, Petitioner lived with and cared for his dementia-stricken mother. (*Id.* at 28, 53-54). It was evident from the testimony of Petitioner's brother and sister-in-law, but particularly of Judith English, that caring for his mother took a tremendous toll on Petitioner. (*Id.* at 73, 81-82).

The jury also learned that Petitioner's brother and sister-in-law noticed a change in Petitioner's mental condition and demeanor following his discharge from the Navy. (*Id.* at p. 30). Petitioner became easily agitated and grew so difficult to get along with that Petitioner's brother and sister-in-law eventually ceased all interaction with him. (*Id.* at 35). Petitioner experienced difficulty holding a job, as evidenced by his admission to Karen Bader that he had had 49 jobs over a span of 20 years. (*Id.* at 99). Most notably, the jury learned, Petitioner became increasingly paranoid of neighbors and his family to the point that he would not even permit his brother or sister-in-law to see Petitioner's mother. (*Id.* at 34). Petitioner's increasingly disturbing behavior was significant enough to prompt Petitioner's brother and sister-in-law to reach out to a county mental health service on Petitioner's behalf, although nothing ultimately came of their referral. (*Id.* at 32). The jury learned that Petitioner frequently expressed religious ideations such as being a prophet of God. (*Id.* at 37, 56).

Testimony by Central Ohio Area Agency on Aging case manager Judith English and vocational counselor Karen Bader established Petitioner's attempts and ultimate failure to stabilize and improve his life. (*Id.* at 68-143). Petitioner met with English on multiple occasions in an

effort to gain assistance caring for his mother so that he could more easily get job training and possibly move in with Denise Roberts. (*Id.* at 70). After meeting several times with Bader, Petitioner took vocation tests and assessments showing that he possessed an aptitude in the area of computers. (*Id.* at 106, 126). Counting on assistance with his mother and related government benefits, Petitioner planned to go back to school to get training on computers. (*Id.* at 115-16). Petitioner ultimately received neither assistance caring for his mother nor government benefits to help cover costs.

Defense counsel called as their final witness Dr. Kathleen Burch. (Tr. Vol. IX, at 144-237). Dr. Burch met with Petitioner on four occasions: October 30, 1998; February 12, 1999; March 12, 1999; and April 19, 1999. She spent a substantial amount of time interviewing Petitioner, administering a battery of psychological tests on Petitioner, and collecting and reviewing records from Petitioner's background. Dr. Burch also interviewed Petitioner's brother, sister-in-law, and former sister-in-law and consistently touched base with the defense team. Dr. Burch demonstrated a thorough awareness and understanding of Petitioner's background. She described the myriad of paranoid delusions that Petitioner had expressed, such as being a prophet of God, believing that certain weather occurrences were related to his case, and complaining that television personalities were stealing his ideas. (*Id.* at 165, 177). She also noticed that the delusions seemed to be increasing in frequency and severity. She testified that by her final visits, Petitioner had grown angrier and more distrustful. (*Id.* at 180).

Dr. Burch proceeded to testify that although she originally sensed that Petitioner was demonstrating a schizoid-affective disorder, which is a combination of a mood disorder and a psychotic disorder, she ultimately was of the view that Petitioner suffered from full-blown

60

paranoid schizophrenia. (*Id.* at 166). Dr. Burch explained that paranoid schizophrenia is a major mental illness. She also explained that the unique convergence of significant stressors—the denial of benefits related to the care of his mother and Denise Roberts pulling back from their relationship—combined with his deteriorating mental illness, culminated in his commission of the offenses (of which Petitioner steadfastly denied having any recollection). Dr. Burch further provided reasons discounting the likelihood that Petitioner was malingering or embellishing. (*Id.* at 209-211).

The foregoing demonstrates that defense counsel decided upon a cohesive mitigation strategy supported by more than sufficient investigation and presented substantial evidence in furtherance of that strategy. *See Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after thorough investigation of law and facts are virtually unchallengeable."). That undermines Petitioner's argument that defense counsel contravened prevailing professional norms when they failed to additionally call friends Jim Gantt, Karl Jeney, and Tom Callahan, and former sister-in-law Susan Tinnerello.

Although the discussion above is dispositive of Petitioner's claim, the Court further finds that Petitioner cannot satisfy the prejudice component of the *Strickland* test. First, the information that Petitioner presented in postconviction, consisting of four affidavits (App. Vol. IV, at 154-64), sets forth little substantive information, especially in comparison to the information that defense counsel did present during Petitioner's mitigation hearing. Second, although not cumulative in the sense that it was word-for-word duplicative, there was considerable overlap between the omitted information that Petitioner's friends and former sister-in-law would have provided and the information that was presented, such as evidence of Petitioner's dysfunctional parents and the

growing deterioration of Petitioner's mental state.  This Court is of the view that what was omitted was not substantially different from, or more impactful than, what was presented.  And the possibility of the omitted testimony "humanizing" Petitioner is simply too speculative to constitute a probability that its inclusion would have changed the outcome of Petitioner's mitigation proceeding.  It thus cannot be said that but for counsel's failure to present the omitted information, there is a reasonable probability that the jury would have returned life sentences.  *See, e.g.*, *Beuke*, 537 F.3d at 645 (finding that although some of the omitted evidence in mitigation, such as the petitioner's low self-esteem and the degree of his parents' sheltering him, was not cumulative, "this non-cumulative evidence is not powerful mitigating evidence that is reasonably likely to have changed the jury's recommendation of death").

Petitioner's case is distinguishable from those in which the Sixth Circuit found ineffective assistance of counsel for failure to investigate and present additional mitigation evidence.  The Sixth Circuit has found ineffective assistance where counsel failed to present any evidence or arguments in mitigation.  *See, e.g.*, *Hamblin v. Mitchell*, 354 F.3d 482, 490 (6th Cir. 2003); *Groseclose v. Bell*, 130 F.3d 1161, 1166 (6th Cir. 1997); *Rickman v. Bell*, 131 F.3d 1150, 1157 (6th Cir. 1997) (prejudice inferred because deficiencies were so severe); *Austin v. Bell*, 126 F.3d 843, 849 (6th Cir. 1997).  But Petitioner's is not such a case.  In *Harries v. Bell*, 417 F.3d 631, 637-39 (6th Cir. 2005), the Sixth Circuit found ineffective assistance where counsel limited their mitigation investigation to telephoning the petitioner's mother and brother; sending requests for information to institutions where the petitioner had been confined; interviewing the petitioner, the petitioner's co-defendant, and two state witnesses; declining to obtain a mental-health expert despite indications from the petitioner's mother of mental problems; and failing to adequately

investigate the petitioner's background despite indications of a troubled childhood. Petitioner's counsel here did significantly more in the way of investigation and presentation. (*See supra* at 58-62). There is no indication in the record that there were any glaring or obvious leads that Petitioner's counsel inexplicably failed to follow up on during their investigation. The Court thus is not persuaded that Petitioner's defense counsel performed deficiently and to his prejudice by failing to call certain friends or his former sister-in-law to testify at the mitigation hearing. The Court accordingly **DENIES as without merit** Petitioner's fifth ground for relief.

**Ground Eight:** **Guilt-Phase and Penalty-Phase Ineffective Assistance of Counsel**

In his eighth ground for relief, Petitioner asserts four instances of alleged ineffective assistance by his trial lawyers: (a) counsel's failure to object to hearsay testimony; (b) counsel's failure to call a psychologist during the guilt phase of Petitioner's trial; (c) counsel's failure to object to the prosecution's improper penalty-phase rebuttal closing argument; and (d) counsel's failure to object to penalty-phase instructions that required the jury to first unanimously reject a death sentence before considering the life-sentence options. (ECF No. 107, at Page ID # 5410-5413). The Court will address each in turn.

**(A) Defense counsel's failure to object to hearsay testimony.**

Petitioner asserts that "[t]he testimonies of John Tolber, James Davis, Officer Michael Tucker and Victoria Hauser were filled with hearsay which was not objected to by defense counsel." (*Id*. at Page ID # 5410-5411). Noting that the testimonies in question revealed that Denise Roberts was afraid of Petitioner and that Petitioner had a recent history of brandishing a firearm at, and having other tense run-ins with, a neighbor, Petitioner argues that defense counsel should have objected to the hearsay.

Respondent argues that Petitioner's claim does not warrant habeas corpus relief because trial counsel were not constitutionally obligated to object to every out-of-court statement and the Ohio Supreme Court's decision rejecting Petitioner's claim did not unreasonably apply *Strickland*. (ECF No. 65, at Page ID # 982-985).

The issue before the Court, as Respondent notes, is whether the Ohio Supreme Court's adjudication of Petitioner's claim involved an unreasonable application of clearly established federal law.  Only if the Court answers that inquiry in the affirmative may the Court proceed to consider whether Petitioner's claim warrants habeas corpus relief.

Petitioner preserved this claim for habeas review by raising it on direct appeal.  The Ohio Supreme Court considered and rejected it as follows:

> Braden also argues that his counsel were ineffective by failing to object to hearsay testimony.  First, Braden claims that counsel erred by not objecting to testimony that Roberts was afraid of him.  On August 3, 1998, Hauser accompanied Roberts to her car because Braden was waiting for her in the parking lot.  When asked if Roberts was happy to see Braden, Hauser testified that Roberts was "terrified."  During later testimony, Hauser repeated that Roberts was "afraid of him."

> Hauser's testimony that Roberts was "terrified" or "afraid" was not hearsay, as the witness was stating her own impression of Roberts's emotions at the time.  However, even if the witness had been relating Roberts's words, the statements would have been admissible as statements of the declarant's then-existing state of mind under Evid.R. 803(3).  State v. Apanovitch (1987), 33 Ohio St.3d 19, 21-22, 514 N.E.2d 394.  Thus, counsel were not ineffective by failing to object to Hauser's testimony.

> Second, Braden claims that his counsel were ineffective by failing to object to Officer Tucker's testimony that Roberts reported that Braden had "keyed" her car.  On August 3, between 8:00 p.m. and 9:30 p.m., Roberts reported at a police substation that Braden had damaged her car.  According to Officer Tucker, Roberts was "hysterical" and told him "that she had just gotten in an argument with her boyfriend and that he had keyed up her car."  Contrary to Braden's assertions, his trial counsel did object to Tucker's testimony.  Thus, this complaint lacks merit.

As an alternative argument, Braden claims that the trial court erred by failing to sustain the defense objection to Roberts's hearsay statement. However, Roberts's statement was admissible as an excited utterance under Evid.R. 803(2).

To be admissible under Evid.R. 803(2), a statement must concern "'some occurrence startling enough to produce a nervous excitement in the declarant,' which occurrence the declarant had an opportunity to observe, and must be made 'before there had been time for such nervous excitement to lose a domination over his reflective faculties.'" _State v. Huertas_ (1990), 51 Ohio St.3d 22, 31, 553 N.E.2d 1058, quoting _Potter v. Baker_ (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E.2d 140, paragraph two of the syllabus. Here, Roberts observed Braden damaging her father's car, and she was still in an agitated state over the incident when she spoke to Officer Tucker. Thus, there was ample evidence to support the trial court's finding that the statement was admissible as an excited utterance.

Finally, Braden argues that his counsel were ineffective by failing to object to parts of Officer Tucker's testimony. Tucker testified that after talking to Roberts about Braden's "keying" her father's car, Tucker drove towards Braden's house to talk with him. The testimony further recounted that Tucker had parked his cruiser a short distance from Braden's home, and Craddock pulled his van behind the cruiser. Craddock was "upset, saying that his next-door neighbor had pointed a firearm at him." In further talking to Tucker, Craddock "stated that he had trouble with his next-door neighbor in the past, and stated that every time he gets into it with his girlfriend, he basically goes crazy."

Craddock's statement that Braden pointed a firearm at him was admissible as an excited utterance under Evid.R. 803(2). Here, Craddock was reporting a startling event that had just occurred, and he was visibly upset when reporting the incident to Tucker. However, Craddock's comments about his past problems with Braden were not admissible under Evid.R. 803(2) because these comments appear to be the result of reflective thought. See _State v. Taylor_ (1993), 66 Ohio St.3d 295, 303, 612 N.E.2d 316 (declarant's reflection on an event and giving a narrative account was the result of reflective thought and not an excited utterance).

Even assuming that counsel erred, Braden does not show any reasonable probability that, but for his counsel's actions, the outcome of his case would have been different. _Bradley_, 42 Ohio St.3d at 143, 538 N.E.2d 373. Craddock testified as a prosecution witness that Braden had pointed a gun at him on the evening of August 3 and that he had seen Braden previously with a firearm "eight or nine times, ten times." Other evidence of Braden's erratic behavior during his arguments with Roberts negated any possibility that Craddock's comments affected the outcome of this case. Moreover, we find that compelling evidence of Braden's guilt eliminated any possible influence of Craddock's comments on the case's outcome. Therefore, we reject this claim of ineffective assistance.

65

*Braden*, 98 Ohio St. 3d at 371-73; App. Vol. III, at 249.

The Court cannot conclude that the Ohio Supreme Court's decision constituted an unreasonable application of *Strickland*. A reviewing court must focus its consideration on the reasonableness of counsel's conduct under prevailing professional norms. *Strickland*, 466 U.S. at 688. In *Lundgren v. Mitchell*, the Sixth Circuit explained:

> As a threshold matter, in a trial of any size, numerous potentially objectionable events occur. "[T]he Constitution does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Engle v. Isaac*, 456 U.S. 107, 134, 102 S. Ct. 1558, 71 L.Ed.2d 783 (1982). Moreover, experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. Learned counsel therefore use objections in a tactical manner. In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice. *See Hodge v. Hurley*, 426 F.3d 368, 376 (6th Cir. 2005) ("[C]ounsel's failure to object to *any* of the numerous improper statements in the prosecution's closing argument is well outside [professional norms].") (emphasis in original).

440 F.3d 754, 774-75 (6th Cir. 2006).

Thus, when reviewing a claim of ineffective assistance of counsel for failure to object to hearsay, courts begin with a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Schauer v. McKee*, 401 F. App'x 97, 100 (6th Cir. 2010) (citations omitted). Consequently, the Sixth Circuit has held that reasonable decisions are permissible even if mistaken. *Id*. (citing *Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002)). In *Schauer*, the Sixth Circuit concluded that defense counsel's failure to object to hearsay was reasonable because counsel managed to glean inconsistencies from the hearsay and use those to undermine the complainant's credibility. *Id.* Acknowledging that counsel's strategy was

reasonable, even if ultimately unsuccessful, the Sixth Circuit reminded that the Constitution does not guarantee every criminal defendant a successful defense. *Id.* (citations omitted).

The failure of Petitioner's counsel to object to certain hearsay did not offend prevailing professional norms. This Court agrees with, and certainly does not find unreasonable, the Ohio Supreme Court's determination that all but one of the challenged testimonies either did not constitute hearsay or fell within a hearsay exception. *See, e.g.*, *Robins v. Fortner*, 698 F.3d 317, 335-36 (6th Cir. 2012) (finding that although counsel could have been more vigilant during testimony of witness who related hearsay, review of the trial in its entirety demonstrated that shortcomings were not so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment). Moreover, repeated objections can work to the detriment of a defendant, either by exasperating the jury or by drawing undue attention to damaging testimony. *Cf. Hardamon v. United States*, 319 F.3d 943, 949 (7th Cir. 2003) ("A competent trial strategy frequently is to mitigate damaging evidence by allowing it to come in without drawing additional attention to it, such as an objection would."); *see also Lundgren*, 440 F.3d at 774. Viewing the trial as a whole, this Court cannot find that counsel's failure to object to the testimonies in question essentially defaulted Petitioner's case to the state or was so consistent and glaring that it cannot be said to have been part of counsel's trial strategy.

Although Petitioner's failure to meet the deficient-performance prong of *Strickland* is dispositive of his claim, the Court further finds that Petitioner cannot demonstrate prejudice. 466 U.S. at 697. Beyond the testimonies that Petitioner challenges, only one of which the Ohio Supreme Court found to be improper hearsay, the record contained other admissible evidence of the increasingly volatile relationship between Roberts and Petitioner, tense conversations between

Roberts and Petitioner on the evening of the murders, and Petitioner's pointing a gun at neighbor Shawn Craddock on the night of the murders. Petitioner's neighbor, Shawn Craddock, testified that on the night of the murders, Petitioner, while standing in a window in his house looking out, pointed a gun at Craddock. (Tr. Vol. VI, at 189-90). Defense counsel themselves elicited during cross-examination of Craddock that he had overheard Petitioner and Roberts arguing that night. (*Id*. at 196). Security guard John Tolber testified as to his own observation of what appeared to be an "intense" conversation between Petitioner and Roberts in the parking lot. (*Id*. at 154). Surveillance videos admitted into evidence seemed to corroborate Tolber's observation in that regard. Victoria Hauser testified as to her personal observations and impressions of the volatile relationship between Petitioner and Roberts and the danger Hauser feared Petitioner posed to Roberts. (*Id*. at 165, 167, 168, 170-71, 172, 172-73). During the testimony of Crime Scene Unit Officer Tim Dorn, the prosecution played for the jury an admittedly poor-quality answering machine tape (Tr. Vol. VIII, at 56) of an agitated message Petitioner left Roberts after he had keyed her car and shortly before the murders pleading for her to call him. (Tr. Vol. VII, at 78). Viewing the trial in its entirety, the Court cannot conclude that but for counsel's failure to object to the hearsay alleged by Petitioner, there is a reasonable probability that the outcome of Petitioner's trial would have been different. *See Strickland*, 466 U.S. at 694.

**(B)  Defense counsel's failure to call Dr. Burch during the guilt phase.**

Petitioner argues that defense counsel were ineffective for failing to call Dr. Burch during the guilt phase of his trial. (ECF No. 107, at Page ID # 5411). According to Petitioner, Dr. Burch's testimony about Petitioner's twenty-six years of mental illness and noticeably deteriorating mental health during the trial could have supported a jury instruction on voluntary manslaughter and other

potential defenses. With respect to the voluntary-manslaughter instruction, Petitioner asserts that Dr. Burch's testimony would have enabled defense counsel to argue that Petitioner lacked the requisite *scienter* element. (ECF No. 59, at Page ID # 864). Petitioner further asserts that Dr. Burch's testimony also could have enabled defense counsel to attack the prosecution's inferential evidence of Petitioner's mental state. (*Id*. at Page ID # 865).

Respondent argues that Petitioner's claim is without merit because defense counsel were under no constitutional obligation to call Dr. Burch during the guilt phase. (ECF No. 65, at Page ID # 985). "The Ohio Supreme Court," Respondent notes, "not only rejected this ineffective assistance of counsel claim, but also rejected the underlying claim that Braden was entitled to a lesser included offense of voluntary manslaughter." (*Id*.)

The Court's inquiry begins with the Ohio Supreme Court's decision adjudicating Petitioner's claim on the merits. The Ohio Supreme Court considered and rejected not only Petitioner's claim that he was entitled to an instruction on the lesser included offense of voluntary manslaughter but also Petitioner's claim that his attorneys were ineffective in failing to call Dr. Burch to support the giving of such an instruction. The Ohio Supreme Court explained:

> In proposition of law II, Braden claims that the trial court erred by refusing Braden's request for an instruction on voluntary manslaughter. Braden argues that he was entitled to this instruction because Roberts's desire to end their relationship, coupled with his fragile mental health, provoked the killings.

> R.C. 2903.03(A), which defines "voluntary manslaughter," provides, "No person, while under the influence of sudden passion or in a sudden fit of rage, *either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force*, shall knowingly cause the death of another * * * . (Emphasis added).

> Voluntary manslaughter is considered an inferior degree of aggravated murder, since "its elements are * * * contained within the indicted offense, except for one or more additional mitigating elements." *State v. Benge* (1996), 75 Ohio

69

St.3d 136, 140, 1996 Ohio 227, 661 N.E.2d 1019, quoting *State v. Deem (1988), 40 Ohio St.3d 205, 533 N.E.2d 294*, paragraph two of the syllabus.  Before giving an instruction on voluntary manslaughter in a murder case, the trial court must determine "whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction."  *State v. Shane (1992), 63 Ohio St.3d 630, 590 N.E.2d 272*, paragraph one of the syllabus.  The initial inquiry requires an objective standard:  "For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control.  Id. at 635, 590 N.E.2d 272.

Braden argues that Roberts provoked him when she ended their relationship.  However, Roberts's breakup with Braden was not sufficient provocation to warrant an instruction on voluntary manslaughter.  Rejecting a similar argument in *Shane, 63 Ohio St.3d at 638, 590 N.E.2d 272*, we held that the defendant was not sufficiently provoked to act under the influence of sudden passion or in a sudden fit of rage by his fiancee's words informing him of her sexual infidelity.  We concluded that the victim did very little to provoke Shane and that "words alone" will not constitute sufficient provocation to incite the use of deadly force in most situations.  Id., paragraph two of the syllabus.

In the instant case, the facts show that Roberts did nothing to provoke Braden.  Rather, Braden confronted Roberts in the parking lot, damaged Heimlich's car, called Roberts at home, and then drove to the victims' house and killed them.  Moreover, Braden's act of killing his victims by shooting Heimlich five times and shooting Roberts in the back of the head demonstrate purposeful killing.  See *State v. Carter (2000), 89 Ohio St.3d 593, 602, 2000 Ohio 172, 734 N.E.2d 345* (voluntary manslaughter instruction denied where the victim was stabbed 18 times).

Braden argues that lesser provocation should be deemed sufficient to warrant a voluntary manslaughter instruction because he does not possess or use the rational thought processes of most people.  Braden contends that he has suffered numerous life-long mental health problems, the loss of countless jobs, the recent denial of welfare and educational benefits, and the stress of caring for an elderly mother.  Regardless, because the defense presented evidence about these problems only during the penalty phase of the trial, that evidence cannot be considered on this issue.

Even assuming that Braden subjectively could be easily provoked to act under the influence of a sudden passion or in a sudden fit of rage, there still must be *serious provocation occasioned by the victim*.  We reject this argument because nothing that Roberts did constituted "serious provocation."  See *Shane, 63 Ohio St.3d at 630, 638, 590 N.E.2d 272* (psychologist's testimony about defendant's propensity to be provoked insufficient to warrant instruction on voluntary manslaughter).

Finally, Braden claims that Roberts provoked him after he damaged her car (i.e., made him angrier, upset that she might call the police, and worried she would not re-establish their relationship). We reject such a speculative argument.

Alternatively, Braden claims that his counsel were ineffective by failing to introduce any evidence at the trial phase that could have bolstered a jury charge of voluntary manslaughter. Specifically, Braden claims that Dr. Burch's testimony about his mental health problems should have been presented to support his request for an instruction on voluntary manslaughter. However, that testimony was not sufficient evidence of provocation warranting an instruction on voluntary manslaughter. We find that Braden's counsel were not deficient. See _Strickland v. Washington_, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674. For the foregoing reasons, we overrule proposition II.

_Braden_, 98 Ohio St. 3d at 365-67; App. Vol. III, at 245-46.

This Court agrees with the analysis of the Ohio Supreme Court. Testimony from Dr. Burch that Petitioner, due to his compromised mental state, actually was under sudden passion or a sudden fit of rage that incited him to use deadly force would have been appropriate to support an instruction on voluntary manslaughter _only_ if the record contained reasonable evidence of provocation. The Ohio Supreme Court determined that the record did not. As explained below, that determination was not unreasonable.

Under Ohio law, "voluntary manslaughter" is an inferior degree of aggravated murder, insofar as its elements are contained within the elements of aggravated murder, save for one or more mitigating elements. _See, e.g._, _State v. Shane_, 63 Ohio St. 3d 630, 632 (1992) (citing _State v. Tyler_, 50 Ohio St. 3d 24, 36 (1990)). In this case, the potential mitigating elements are sudden passion or a sudden fit of rage brought on by serious provocation occasioned by the victims that was reasonably sufficient to incite Petitioner into using deadly force. _Shane_, 63 Ohio St. 3d at 634 (discussing Ohio Rev. Code § 2903.03(A)). In _Shane_, the Ohio Supreme Court explained that

> [a]n inquiry into the mitigating circumstances of provocation must be broken down into both objective and subjective components.  In determining whether the provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage, an objective standard must be applied.  Then, if that standard is met, the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or a sudden fit of rage.  It is only at that point that the " * * * emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time * * * " must be considered.  *Deem, supra*, paragraph five of the syllabus.  If insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction.  In that event, the objective portion of the consideration is not met, and no subsequent inquiry into the subjective portion, when the defendant's own situation would be at issue, should be conducted.

*Shane*, 63 Ohio St. 3d at 634 (quoting *State v. Deem*, 40 Ohio St. 3d 205 (1988)).  The Ohio Supreme Court then noted that the types of situations typically regarded as sufficient to meet the objective component of "provocation" include assault and battery, mutual combat, illegal arrest, and discovering a spouse in an act of adultery.  *Shane*, 63 Ohio St. 3d at 635.  The court made clear that "mere words" are generally insufficient to constitute "provocation."  *Id.* (collecting cases).  The court declined, however, to adopt a bright-line test and directed courts in any case where "mere words" purport to serve as the basis of the provocation to thoroughly examine the facts and circumstances in determining whether the victim reasonably provoked the accused.  *Id.* at 635-37.

The Ohio Supreme Court also made clear in *Shane* that a voluntary-manslaughter instruction is not required every time the record contains "some evidence" that would reasonably support acquittal on the charged crime of aggravated murder and conviction on the inferior offense of manslaughter, but rather "when sufficient evidence is presented which would allow a jury to *reasonably* reject the greater offense (murder) and find the defendant guilty on a lesser included (or inferior-degree) offense."  63 Ohio St. 3d at 633-34.

72

Against this backdrop, no reasonable jury could have decided that any actions by Denise Roberts or her father Ralph Heimlich in the minutes, hours, or even days preceding the murders reasonably provoked Petitioner to use deadly force, warranting an instruction on voluntary manslaughter.  As a preliminary matter, Shawn Craddock testified that approximately two hours before the killings, he heard Petitioner and Roberts arguing and then Roberts pulling out of Petitioner's driveway.  (Tr. Vol. VI, at 188-89).  Craddock further testified that an hour or so later and shortly before the killings, he observed Petitioner not ranting or raving or otherwise behaving in a frenzied manner but standing in his front window pointing a gun at Craddock.  (*Id.* at 189-90).  That testimony reveals not only a more than sufficient period between Petitioner's argument with Roberts and the killings during which Petitioner could have cooled down but also a composed demeanor on the part of Petitioner very shortly before the killings.  The time that it would have taken Petitioner to drive from his home to the victims' home would have provided an additional period in which to cool down.  *See State v. Huertas*, 51 Ohio St. 3d 22, 32 (1990) (voluntary-manslaughter instruction not warranted where even accepting dubious explanation of provocation, defendant had more than sufficient time to cool down).  Further, that Petitioner fired five bullets into Heimlich and one into the back of Roberts's head is more consistent with calculated behavior than frenzied impulse.  *See State v. Carter*, 89 Ohio St. 3d 593, 602 (2000) (voluntary-manslaughter instruction not warranted where defendant stabbed victim eighteen times).

From the record in this case, the Court finds nothing rising to the level of "serious provocation."  *See Shane*, 63 Ohio St. 3d at 638.  Roberts demonstrated apprehension from Petitioner's showing up at her workplace.  Roberts arguably exhibited reluctance to talk with Petitioner after he showed up at her workplace.  Roberts reported to police that Petitioner had

keyed the car she was driving. Roberts failed to answer her phone when Petitioner called or to return his call as his voice message requested. It is true that Petitioner and Roberts argued, but all of the evidence points to Petitioner, not Roberts, being the aggressor during those arguments. All that Heimlich apparently did, moreover, was disapprove of his daughter's relationship with Petitioner. *See Braden*, 98 Ohio St. 3d at 355 ("Heimlich thought [Braden] was a 'scumbag'").

Under Ohio law and the facts of this case, no psychological testimony about propensity was permitted. *Shane*, 63 Ohio St. 3d at 638; *see also State v. Bainum*, No. CA99-12-217, 2001 WL 1112188, at *2-3 (Ohio App. 12 Dist. Sep. 24, 2001). That being so, Petitioner cannot demonstrate either deficient performance or prejudice from the failure of his counsel to call Dr. Burch during the guilt phase.

**(C) Defense counsel's failure to object to prosecution's rebuttal closing argument.**

Petitioner argues that trial counsel were ineffective for failing to object to the prosecution's improper rebuttal closing argument during the penalty phase. (ECF No. 107, at Page ID # 5411-5412). "It is improper," Petitioner states, "for prosecutors in the penalty phase of a capital trial to make any comment that the nature and circumstances of the offense are [an] 'aggravating circumstance.'" (*Id*. at Page ID #5411 (citing *State v. Wogenstahl*, 75 Ohio St. 3d 344 (1996))). Petitioner asserts that the prosecution repeatedly referred to the fact that Petitioner shot both victims while they were in their home, thereby improperly converting the nature and circumstances of the offense into an aggravating circumstance. Petitioner also challenges counsel's failure to object when the prosecution argued that Petitioner's sanity essentially was an aggravating circumstance.

Respondent first argues that this claim is waived because Petitioner did not fairly present it to the state courts and now no longer can.  (ECF No. 65, at 65, at Page ID # 981).  Respondent further argues that Petitioner's claim is without merit not only because counsel were under no obligation to object to the prosecution's penalty-phase rebuttal closing argument, but also because despite Petitioner's attempt to federalize this issue, the underlying basis of his claim is a matter of state law, not federal constitutional law.  (*Id*. at Page ID # 987-88).  Respondent essentially argues that because the challenged remarks were not improper under state law, trial counsel did not perform deficiently in failing to object to them.  Respondent further argues that, even assuming counsel were deficient in that regard, Petitioner cannot demonstrate prejudice because "[i]t would be pure conjecture to assume that the jury would not have given Braden the death penalty 'but for' the prosecutor's one statement that Braden's sanity was aggravating." (*Id.* at Page ID # 988).

Initially, the Court declines to find that Petitioner's claim is procedurally defaulted because Respondent chose not to raise this argument in her motion to dismiss certain claims for procedural default.  (ECF No. 21).

The Court concludes, in any event, that Petitioner's claim is without merit.  As noted throughout this decision, courts reviewing a claim of ineffective assistance begin with a strong presumption that counsel's performance fell within the wide range of reasonable professional assistance.  Upon review of the penalty-phase rebuttal closing argument in its entirety, the Court concludes that the challenged remarks were not so clearly improper that counsel's failure to object cannot be said to have been reasonable trial strategy.  The prosecution's emphasis on the victims having been killed while in their home is not improper.  (Tr. Vol. X, at 50-51).  The prosecution did not encourage the jury to construe that fact as aggravating rather than mitigation, and

prosecutors may reference the circumstances of the offense to dispel the existence of mitigating value. *See Slagle v. Bagley*, 457 F.3d 501, 519 (6th Cir. 2006). Although the prosecution attempted to equate Petitioner's lack of insanity with an aggravating circumstance (Tr. Vol. X, at 54-57), the argument read as a whole was nothing more than the prosecution attempting to persuade the jury why they should accord Petitioner's claimed mental problems little weight in mitigation. In fact, the prosecution subsequently used the word "mitigation" in reference to evidence concerning Petitioner's mental state. (*Id*. at 57-58). Finally, as noted earlier, repeated objections can work to a client's detriment either by drawing undue attention to adverse evidence or by irritating the jury.

The Court further finds no prejudice stemming from counsel's conduct. The remarks in question were not pervasive. *See United States v. Beasley*, 583 F.3d 384, 392-93 (6th Cir. 2009) (finding that whether statements of prosecutor "were isolated or pervasive" is one of several factors used to determine the flagrancy of a prosecutor's remarks); *see also Wilson v. Bell*, 368 F. App'x 627, 636 (6th Cir. 2010) (finding that counsel's failure to object to isolated instance of prosecutorial misconduct was not objectively unreasonable). The jury was properly instructed as to the definition and weighing of aggravating circumstances and mitigating factors and is presumed to have followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). In sum, the Court simply cannot conclude that but for counsel's failure to object to remarks whose impropriety is debatable, there is a reasonable probability that the outcome of the penalty phase would have been different. *See Strickland*, 466 U.S. at 694.

**(D)  Counsel's failure to object to the penalty-phase "unanimity" instruction.**

Petitioner argues that his defense attorneys were ineffective for failing to object when the trial court instructed the jury that it had to first unanimously reject a death sentence before considering imposition of a life sentence.  (ECF No. 107, at Page ID # 5412-5413).  Petitioner reasons that "[t]he trial court's admonition that any recommendation must be unanimous, even a recommendation of life imprisonment, left the jurors unaware that a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors."  (*Id.* (citing *Mills v. Maryland*, 486 U.S. 367 (1988))).

Respondent first argues that Petitioner's claim is not properly before the Court because Petitioner presented to the state courts a "failure to argue" claim, while presenting herein a "failure to object" claim.  (ECF No. 65, at Page ID # 981).  Respondent's argument is not well taken in light of her failure to raise it in her March 9, 2005 motion to dismiss procedurally defaulted claims. (*See* ECF No. 21).

Respondent also argues that Petitioner's claim is without merit because defense counsel were under no constitutional obligation to object to the instructions at issue.  (ECF No. 65, at Page ID # 989-991).  Respondent asserts that the jury instructions in question "were not even remotely similar to the prohibited instructions given in *Mills*."  (*Id.* at Page ID # 989).  Respondent explains that "[i]n *Mills*, the trial court's instructions would not allow the jury to give effect to any mitigating factor unless the jury unanimously agreed that the factor was mitigating."  (*Id.*)  Setting forth several excerpts from the penalty-phase instructions (*id.* at Page ID # 989-990), Respondent argues that "[i]n contrast to *Mills*, the trial court's instructions in this case gave the jurors an

opportunity to consider and give effect to all of Braden's mitigating evidence." (*Id*. at 991).  The Court agrees.

Regardless of whether Petitioner expressly raised a claim challenging counsel's failure to object to the trial court's penalty-phase "unanimity" instruction, the fact remains that Petitioner did raise a claim challenging the instruction itself, and this Court begins its analysis there.  The Ohio Supreme Court held as follows:

> In proposition of law IX, Braden claims that the trial court's instructions called for a unanimous vote for a life sentence, thereby violating *State v. Brooks* (1996), 75 Ohio St.3d 148, 1996 Ohio 134, 661 N.E.2d 1030.  Braden objects to the following instruction:  "You shall sentence the defendant to death only if you unanimously find by proof beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors.  If you do not so find, you shall consider either a sentence of life with[] parole eligibility, after serving twenty-five (25) full years of imprisonment, or a life sentence with parole eligibility after serving thirty (30) full years of imprisonment, or a sentence without parole eligibility."  However, Braden did not object to these instructions at trial and waived all but plain error.  *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus, death sentence vacated on other grounds, *Williams v. Ohio* (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L. Ed. 2d 1156.

> In *Brooks*, the trial court charged the jury:  "You are now required to determine *unanimously* that the death penalty is *inappropriate before* you can consider a life sentence."  (Emphasis added).  *Brooks*, 75 Ohio St.3d at 159, 661 N.E.2d 1030.  *Brooks* found error because the trial court's instructions conflicted with R.C. 2929.03(D)(2).  Id. at 160, 661 N.E.2d 1030.

> Here, the trial court's instructions and the defense counsel's closing argument ensured that there was no *Brooks* error.  The defense counsel advised the jury during his summation, "You are not required to determine unanimously that the death sentence is inappropriate before you consider the life sentences.  I will say that again.  That is an instruction you will receive by the court.  You are not required to determine unanimously that the death sentence is inappropriate before you consider the life sentences."  The trial court's voting instructions then advised the jury, "You are *not required to determine unanimously* that the death sentence is inappropriate before you can consider the life sentences."  (Emphasis added).

> Contrary to Braden's contentions, the jurors were not misled by instructions that a life sentence must be unanimous, since there were no such instructions.

Rather, the trial court's instructions emphasized juror unanimity before returning a death verdict.

Finally, Braden argues that the trial court erred by failing to give a "lone-juror" instruction. However, Braden did not request a lone-juror instruction at trial and thus waived all but plain error. _Williams_, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. Here, the court's instructions implicitly advised the jury that a single juror could prevent the death penalty. We find that the trial court's failure to give this instruction was not plain error, and we reject proposition IX.

_Braden_, 98 Ohio St. 3d at 367-68; App. Vol. III, at 246-47.

Petitioner's claim is without merit because the Court cannot find counsel ineffective for failing to object to an error that counsel helped guard against during closing arguments and that ultimately did not occur during jury instructions. The order in which the trial court instructed the jury as to the punishments it could consider, as well as the language that the trial court used (Tr. Vol. X, at 69), essentially mirrored Ohio's capital sentencing statute. Ohio Rev. Code § 2929.03. Counsel are generally not ineffective for failing to object to instructions that followed statutory language. _See, e.g._, _Waddington v. Sarausad_, 555 U.S. 179, 191-92 (2009) (holding that state court's instructions were not erroneous because the "instruction parroted the language of the statute"). More importantly, any possible ambiguity caused by the order in which the trial court presented the sentencing options or use of the word "unanimously"—which word is used in Ohio's sentencing statute—was fully allayed by counsel's closing arguments and the unambiguous instruction to the jury that "[y]ou are not required to determine unanimously that the death sentence is inappropriate before you can consider life sentences." (Tr. Vol. X, at 69). Defense counsel bolstered the impact of that instruction before the trial court even gave it when counsel included the following remarks in closing arguments:

Finally, ladies and gentlemen of the jury, I would submit to you that you are not required to determine unanimously that the death sentence is inappropriate before you consider the life sentences.  I will say that again.  That is an instruction you will receive by the court.  You are not required to determine unanimously that the death sentence is inappropriate before you consider the life sentences.

The prosecution likes to structure it the way they feel it is most advantageous to them.  I am simply stating it the way it will be done by the court.  You are not required to determine unanimously that the death sentence is inappropriate before you turn to the life sentences.

(Tr. Vol. X, at 45).  In view of the foregoing, the Court cannot find either that defense counsel performed deficiently in failing to object to the trial court's penalty-phase instructions or that Petitioner suffered prejudice from counsel's omission.  *See Strickland*, 466 U.S. at 690, 694.

The Court **DENIES as without merit** Petitioner's eighth ground for relief.

**Ground Thirteen:  Ineffective Assistance for Failing to Invoke R.C. § 2929.04(B)(3)**

Petitioner argues in his thirteenth ground for relief that his trial counsel performed deficiently and to his prejudice during the mitigation phase of Petitioner's trial when they failed to pursue with defense psychologist Dr. Burch whether Petitioner's mental disease impaired his ability to conform his conduct to the law sufficiently to qualify as a mitigating factor under Ohio Rev. Code § 2929.04(B)(3).[9]  (ECF No. 107, at Page ID # 5418-5419; ECF No. 59, at Page ID # 866).  According to Petitioner, "Dr. Burch signed an affidavit for Petitioner's post-conviction petition in which she states that had trial counsel asked her such a question, she would have testified that Petitioner and his condition did meet the criteria necessary to establish the mitigating factor of O.R.C. § 2929.04(B)(3).  P.C. Ex. 18."  (ECF No. 107, at Page ID # 5418).  Petitioner

---

[9]  Pursuant to Ohio Rev. Code § 2929.04(B)(3), a sentencing court may consider as mitigating "[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law."

further points out that the trial court instructed the jury that it could consider whether Petitioner's mental disease impaired his ability to conform his conduct to the law or appreciate the criminality of his conduct and that the jury submitted a question during sentencing deliberations asking the trial court to explain how a mental disease or defect could be a mitigating factor. (*Id.*)

Respondent concedes that Petitioner's claim is properly before the Court for consideration on the merits but argues that the claim is without merit. (ECF No. 65, at Page ID # 991-996). Respondent argues that because trial counsel's preparation for mitigation is unassailable by virtue of defense counsel's having obtained Dr. Burch's services and presented her testimony about Petitioner's paranoid schizophrenia, Petitioner attempts to attack the manner in which trial counsel elicited Dr. Burch's testimony. "However," Respondent asserts, "the United States Supreme Court has never held that a properly prepared attorney is required to [e]licit testimony at mitigation in a certain particular fashion under the 6th Amendment." (*Id.* at Page ID # 994). Respondent essentially argues that because defense counsel were unquestionably prepared for mitigation, the manner in which they presented their mitigation case is presumed strategic. (*Id.*).

Respondent further argues that Petitioner cannot show prejudice, insofar as the trial court instructed the jury that it could consider Petitioner's mental illness as a mitigating factor under Ohio Rev. Code § 2929.04(B)(3). Respondent argues that it is pure speculation that the jury did not consider Petitioner's paranoid schizophrenia as a § 2929.04(B)(3) mitigating factor simply because Dr. Burch did not mention it. (*Id.*, at Page ID # 995). Respondent further dismisses the import of the jury's question, reasoning that it was simply in response to the trial court's statement during jury instructions that the trial court would further explain the consideration of Petitioner's

mental illness under (B)(7) if the jury were unwilling to consider Petitioner's mental illness under

(B)(3).  (*Id.*, at Page ID # 996).

As Respondent notes, the Ohio Supreme Court considered and rejected Petitioner's claim

on the merits.  This Court's consideration of Petitioner's claim accordingly begins with that

decision, which is as follows:

> Braden claims that his counsel were deficient by failing to develop Dr.
> Burch's testimony to show that his paranoid schizophrenia qualified as an R.C.
> 2929.04(B)(3) mitigating factor.  According to Braden, his counsel also erred by
> eliciting testimony that Braden was sane at the time of the offenses while failing
> to explain the difference between legal insanity and the R.C. 2929.04(B)(3) mitigating
> factor.  Braden argues that his counsel, by not developing this distinction, allowed
> the jury to conclude that Dr. Burch's testimony was irrelevant as a (B)(3) mitigating
> factor.

> The R.C. 2929.04(B)(3) mitigating factor applies where "at the time of
> committing the offense, the offender, because of a mental disease or defect, lacked
> substantial capacity to appreciate the criminality of the offender's conduct or to
> conform the offender's conduct to the requirements of the law."

> Dr. Burch testified that Braden suffered from paranoid schizophrenia, was
> under great stress at the time of the offenses, and may have violently reacted to the
> stress he was under by committing these offenses.  Subsequently, Braden's counsel
> argued that the R.C. 2929.04(B)(3) mitigating factor applied, and the trial court
> instructed the jurors that they could consider evidence of Braden's mental illness a
> mitigating factor under R.C. 2929.04(B)(3).  Thus, Braden's counsel succeeded in
> obtaining an R.C. 2929.04(B)(3) instruction for the jury's consideration.

> However, Braden argues that his counsel were ineffective by failing to elicit
> testimony from Dr. Burch that he lacked the substantial capacity to appreciate the
> criminality of his conduct and thus failed to trigger the language of R.C.
> 2929.04(B)(3).  Because it is highly speculative whether Dr. Burch could have so
> testified, Braden's counsel were not ineffective for failing to pursue this line of
> questioning.  Compare *State v. Hartman* (2001), 93 Ohio St.3d 274, 299, 2001 Ohio
> 1580, 754 N.E.2d 1150 (counsel not ineffective for failing to introduce DNA
> evidence because the results of the DNA examination may not have been favorable
> for the defense).

Finally, we reject Braden's argument that the jury was misled by Dr. Burch's testimony about his sanity because Dr. Burch did not testify that Braden was sane at the time of the offenses.

*Braden*, 98 Ohio St. 3d at 375-76; App. Vol. III, at 251.

Having considered the Ohio Supreme Court's decision, as well as the penalty-phase transcript and record, this Court cannot find that counsel were ineffective or that the Ohio Supreme Court's decision reaching the same conclusion was unreasonable. *See Strickland*, 466 U.S. at 690, 694. Review of the record reveals that any failure on the part of defense counsel to expressly ask Dr. Burch whether Petitioner's mental illness met the Ohio Rev. Code § 2929.04(B)(3) mitigating factor was negligible. Notwithstanding the omission, defense counsel expressly and forcefully offered that mitigating factor in closing arguments, (Tr. Vol. X, at 32, 42-42), and expressly instructed the jury on the 2929.04(B)(3) mitigating factor, (*id*. at 67). The trial court, moreover, in its sentencing decision accorded some weight to Petitioner's mental illness. (App. Vol. II, at 194-97, 197-98). Similarly, the Ohio Supreme Court in its independent review of the appropriateness of the death sentence gave some weight to Petitioner's mental illness. (App. Vol. III, at 255).

In view of the foregoing, the record leaves no valid reason to conclude that the jury accorded Petitioner's mental illness no weight or insufficient weight by virtue of counsel's failure to ask Dr. Burch whether Petitioner's mental illness satisfied the 2929.04(B)(3) mitigating factor. Stated another way, the record does not support a finding that if only defense counsel had asked Dr. Burch whether Petitioner's mental illness satisfied 2929.04(B)(3), there is a reasonable probability that the result of Petitioner's penalty phase would have been different. The Court can find neither deficient performance nor prejudice, much less that the Ohio Supreme Court's

decision was unreasonable. *See Strickland*, 466 U.S. at 690, 694. The Court accordingly **DENIES as without merit** Petitioner's thirteenth ground for relief.

**Grounds Fourteen Through Twenty-Three: Method-of-Execution Claims.**

In grounds fourteen through twenty-three, Petitioner raises a host of Eighth and Fourteenth Amendment claims challenging the constitutionality of Ohio's execution policy, procedures, and practices. (ECF No. 107, at Page ID # 5419-5453). On March 17, 2016, this Court issued an Opinion and Order denying without prejudice Petitioner's August 12, 2015 motion for leave to amend his method-of-execution claims. (ECF No. 113). The Court determined that the parties should be permitted to address the impact of the Sixth Circuit's decisions in *Adams v. Bradshaw*, 644 F.3d 481, 483 (6th Cir. 2011) ("*Adams I*"), on the viability of Petitioner's method-of-execution claims but explained that *Adams* was not yet final. *See Adams*, Case No. 07-3688, 2016 WL 963862 (6th Cir. Mar. 15, 2016) ("*Adams II*"); and *Adams*, Case No. 07-3688, 2016 WL 3244860 (6th Cir. Jun. 13, 2016) ("*Adams III*").

*Adams* is now final and has been abrogated by *In re Campbell*, 874 F.3d 454 (6th Cir. 2017) (per curiam). *Campbell* is dispositive here. In *Campbell*, the Sixth Circuit explained that the Supreme Court's decision in *Glossip v. Gross*, 135 S. Ct. 2726 (2015),

> closed the hypothetical door left open by *Nelson* [*v. Campbell*, 541 U.S. 637 (2004)], *Hill* [*v. McDonough*, 547 U.S. 573 (2006)], and *Adams II.* No longer can a method-of-execution claim impair a death sentence itself. And since a method-of-execution claim can no longer "attack the validity of the prisoner's conviction or death sentence," a habeas court cannot act upon it. [*Glossip*, 135 S. Ct.] at 2738. Thus, the *Glossip* Court necessarily barred all habeas petitions challenging "a particular application of a particular protocol to a particular person" as constitutionally painful. *In re Tibbitts*, 869 F.3d 403, 406 (6th Cir. 2017). These challenges are properly remedied by an injunction prohibiting the state from *taking certain actions*, rather than a writ of habeas corpus that vacates the sentence entirely.

84

*In re Campbell*, 874 F.3d at 462.

Here, grounds fourteen through twenty-three assert method-of-execution claims under the Eighth and Fourteenth Amendments.  Under *Campbell*, such claims are not cognizable in habeas corpus.  Rather, Petitioner must pursue these claims in the § 1983 action in which he is presently a plaintiff.  *See Bays v. Warden, Ohio State Penitentiary*, No. 3:08-cv-076, 2017 U.S. Dist. LEXIS 183511, at *10 (S.D. Ohio Nov. 6, 2017) ("Bays is a plaintiff in the Protocol case (§ 1983 action) and has in that case pleaded an alternative method of execution.  Under *Campbell*, he must be remanded to that remedy.").  The Court accordingly **DENIES as without merit** Petitioner's fourteenth through twenty-third grounds for relief.

## V.  Conclusion

For the foregoing reasons, the Court **DENIES** the following grounds as without merit: one, two, three (also procedurally defaulted), four, five, eight, thirteen, and fourteen through twenty-three. The Court **DENIES** the following grounds as procedurally defaulted: three (also without merit), seven (also abandoned), and eleven (also abandoned).  The Court **DENIES** the following grounds as abandoned:  six, seven (also procedurally defaulted), nine, ten, eleven, and twelve.

The Court **DIRECTS** the Clerk to **ENTER FINAL JUDGMENT** for Respondent on grounds one, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen, seventeen, eighteen, nineteen, twenty, twenty-one, twenty-two, and twenty-three. The Court will address the certificate-of-appealability standards in a separate order.

**IT IS SO ORDERED.**

November 21, 2020

Copies:        Counsel of Record

**David J. Hale, Judge**
**United States District Court**

85